No. 110,954

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LAMAR WILLIS,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court generally reviews a district court's discovery order for abuse of discretion. However, to the extent that the resolution of a discovery request requires statutory interpretation, an appellate court has unlimited review.

2.

Under the facts and circumstances of this case, the district court erred in denying the defendant's discovery request without conducting an in camera inspection of the documents in question.

3.

Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. There are three exceptions to this general rule: (1) the newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason.

**4.**

When a district court provides alternative bases to support its ultimate ruling on an issue and an appellant fails to challenge the validity of each alternative basis on appeal, an appellate court may decline to address the appellant's challenge to the district court's ultimate ruling.

**5.**

An appellate court examines jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.

**6.**

Although the use of Pattern Instructions for Kansas (PIK) instructions is not required, it is strongly recommended, as these instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. However, if the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the district court should not hesitate to make such modification or addition.

**7.**

Under the facts and circumstances of this case, the limiting instruction given by the district court regarding the K.S.A. 60-455 evidence would have been improved by modifying the language to read: "Evidence has been admitted 'alleging' that the defendant committed crimes other than the present crimes charged." However, the jury instructions as a whole properly and fairly stated the applicable law and could not have misled the jury.

8.

An appellate court uses a two-step process to review allegations of prosecutorial misconduct in closing argument. First, an appellate court determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial.

9.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. Given that the reversibility test for cumulative error utilizes a totality of the circumstances approach, an appellate court must necessarily review the entire record and engage in an unlimited review.

10.

An appellate court reviews for abuse of discretion a district court's determination that there were not substantial and compelling reasons to depart from a Jessica's Law sentence. A district court is not obligated to grant a departure sentence simply because mitigating factors exist.

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed October 2, 2015. Affirmed in part, reversed in part, and remanded with directions.

.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Jennifer S. Tatum*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., ARNOLD-BURGER, J., and JOHNSON, S.J.

MALONE, C.J.:  Lamar Willis appeals his convictions of two counts of aggravated indecent liberties with a child, one count of aggravated criminal sodomy, and one count of attempted rape. Willis claims:  (1) the district court erred in denying his requests for discovery; (2) the district court erred by granting the State's motion in limine and excluding certain evidence; (3) the district court violated his due process rights by admitting evidence of prior crimes under K.S.A. 60-455; (4) the district court gave an erroneous limiting instruction regarding the K.S.A. 60-455 evidence; (5) the prosecutor committed misconduct during closing argument; (6) cumulative error requires reversal; and (7) the district court erred by denying his motions for a sentencing departure. We agree, in part, with Willis' claim that the district court erred in denying his requests for discovery, and we remand for the district court to conduct an in camera inspection of certain records. However, we affirm the district court's judgment on all remaining claims.

FACTUAL AND PROCEDURAL BACKGROUND

We will review the facts in detail. In 1996, Sherry Jones and James Newman began dating and, on December 1, 1998, their daughter, J.N., was born. At some point, J.N. went to live with her grandmother. Although Jones and Newman split up around 2001, Newman continued to see J.N. and the two sons he had with Jones.

Also in 2001, Jones met Willis, whom she married in 2003. They lived in Leavenworth, Kansas. Newman's sister, Nicole Newman, and J.N. were close, and on occasion Nicole would pick up J.N. at her grandmother's house and take her to Leavenworth, to Jones and Willis' home. Nicole later testified that on multiple occasions, Jones was not home when Nicole and J.N. arrived at the house, so Nicole would leave J.N. alone with Willis. Jones and Willis divorced within less than a year, but they remained friends and, in 2004, they reconciled and remarried.

4

In 2005, J.N. came to live with Jones, Willis, and J.N.'s brothers in Leavenworth. During that time, Jones worked nights and Willis worked days, so Willis was the only adult with the children at night. Newman later testified that at times he would call Willis and Jones' house and his two sons would be there but Willis and J.N. would not be at home. Also, Newman testified that on at least one occasion, when he picked up J.N. from the house, J.N. and Willis were the only ones home and J.N. was in a bedroom.

*Discovery of Facebook messages*

Jones and Willis divorced for a second time soon after they remarried, but they remained close. In 2006, Nicole helped J.N. set up an email account so that Nicole and J.N. could stay in touch. Nicole knew the password to J.N.'s account and monitored it regularly. At some point, J.N. also obtained a Facebook account, which Nicole learned about when J.N. sent her a friend request on Facebook.

Sylvia Cheney, Jones' sister and J.N.'s aunt, learned in early 2010 that J.N. had two Facebook accounts—one under her own name and one under the name "Jade." Cheney informed Jones, who punished J.N. and told her to delete the accounts. Jones later testified that she discovered that J.N. had been using the false online identity to communicate with older men on Facebook.

In April 2011, Jones and J.N. moved to Kansas City, Kansas. Willis had moved there around the end of 2010. Although he remained in contact with J.N. and her brothers, Willis stated that he moved in part because Jones had become involved with another man and had "pulled the kids away from [Willis]." Jones later testified that Willis spent more time with J.N. than he did with the boys and that Willis bought J.N. items he did not buy the boys, such as a cell phone and a computer.

5

On September 10, 2011, Nicole checked J.N.'s email account and found that Willis had sent Facebook messages to J.N. that Nicole felt were inappropriate. The Facebook messages had been forwarded to J.N.'s email account. Specifically, Nicole found the following message inappropriate:

> "You're my buddy, I consider u one of my best best best friends. As far as I'm concerned, your'e an awesome person,; and God knws I miss u terribly bad. I miss us sitting around talking while Jade try and convince me to let her have company with her horny self. (Is she still like she use to be, wanting to date older guys. . . . n still very horny)? U knw her better than I do. So is she?"

Nicole printed out that message and some others between Willis and J.N. and gave them to Newman, who showed them to Jones. Jones called Willis and asked him what was going on, but Willis laughed it off and told Jones that Jade was one of J.N.'s older friends. Jones and Newman asked J.N. why Willis talked to her as he did in the message, and J.N. repeatedly said she did not know.

At that point, Jones remembered that J.N. had used the identity Jade before. She confronted J.N. and said that she knew J.N. was Jade, but J.N. refused to say anything to either Jones or Newman. Newman took Jones and J.N. to a relative's house, where Jones' family had gathered. Once there, Jones and her sisters spoke with J.N., who ultimately revealed that Willis had touched her sexually. Newman stated that J.N. was "shaken up and crying and shaking." Jones called the police.

*Law enforcement investigation*

Officer Sarah Panjada of the Kansas City, Kansas, Police Department responded to the call and spoke with Jones, whom she described as "upset" and "very animated." Jones told Panjada that her ex-husband had inappropriate contact with J.N. Jones showed Panjada the Facebook messages and said that J.N. had told her that Willis had "been

6

feeling on her and kissing on her." With Jones' permission, Panjada spoke with J.N. Although J.N. appeared uncomfortable and embarrassed, she told Panjada that she and Willis had sexual contact on multiple occasions. According to J.N., Willis had touched her breasts and her genitals, kissed her, and tried to penetrate her vagina with both his fingers and his penis. J.N. also described being naked in a bed with Willis and said he forced her to perform oral sex on him. J.N. had difficulty remembering how far back the abuse went but remembered it happening in April 2007 in Leavenworth.

On September 15, 2011, Erin Weiss, a forensic interviewer, interviewed J.N. at the Sunflower House. In the interview, J.N. described numerous times when Willis had sexually assaulted her. J.N. also stated that Willis took naked photographs of her, showed her a video of Willis and Jones having sex, and told her if she told anyone, both he and Jones would hurt her. On September 19, 2011, pediatric nurse practitioner Jana Etherton-Still examined J.N. at Children's Mercy Hospital and found a notch on J.N.'s hymen, which could have resulted from previous trauma or could have been a normal variant.

On September 20, 2011, police searched Willis' house, supervised by Detective Jackie Lynn. Claude Harper, a member of the crime scene investigation unit, collected a computer, a camera, flash drives, and a tripod and camcorder from the house and seized a laptop computer and flash drive from Willis' truck. Forensic scientist Todd Taylor, who worked at the Heart of America Regional Computer Forensics Laboratory, examined the computer, the cameras, and the flash drives. He found nothing relevant to allegations of sexual abuse on the laptop, the camcorder, the digital camera, the memory card in the digital camera, or one of the flash drives. On another flash drive, in a space where deleted items are found, Taylor found photographs of a bed with no bedding, photographs of a girl, and photographs of the girl with a man. None of the photographs was overtly sexual.

*Criminal charges and prosecution*

On September 22, 2011, the State charged Willis with two counts of rape, two counts of aggravated criminal sodomy, and two counts of aggravated indecent liberties with a child, all off-grid person felonies. After the preliminary hearing, the State asked to amend the information. The district court granted the request, and the State amended the information to charge an additional three counts of aggravated indecent liberties with a child, to charge an additional three counts of aggravated criminal sodomy, and to charge the rape counts in the alternative as attempted rape.

Both parties filed a number of pretrial motions. The district court heard argument and resolved most of the motions at a hearing on November 30, 2012. We will discuss the motions and the district court's ruling in more detail later in this opinion.

The jury trial began on March 25, 2013. The State presented testimony from Nicole, who read into the record the objectionable Facebook message she had shared with Newman. Newman and Jones testified as well. In addition to relating the information above, Jones testified that since moving to Kansas City, J.N. had spent the night at Willis' home a couple of times without her brothers and that Willis had once hired J.N. to clean his kitchen. Cheney testified that she had seen Willis pick up J.N. in his truck. The State played for the jury Jones' 911 call reporting that her ex-husband had molested J.N.

Panjada testified about responding to that call and her contact with Jones and J.N. Harper and Lynn testified about the search of Willis' home. Taylor testified about what he found—and did not find—in his examination of the electronics seized in the search. During his testimony, the State admitted the deleted photographs Taylor discovered on one flash drive. Weiss testified, and the State showed the jury the recording of Weiss' interview with J.N. at the Sunflower House. Etherton-Still testified that she diagnosed child sexual abuse based on J.N.'s history despite the fact that she had a normal exam. On

cross-examination, however, Etherton-Still admitted that her report stated that based on the exam, she neither confirmed nor denied the sexual abuse allegations.

J.N. testified on the last day of the State's case-in-chief. She described incidents in which Willis touched her vagina with his hand, touched her vagina with his penis, touched her breasts, put his penis in her mouth, and attempted to put his penis and his finger in her vagina. She also testified that Willis established both Facebook accounts for her—the one in her own name and the one under the name Jade—and that Willis established an email address under Jade's name.

After the State rested its case, Willis moved for a directed verdict on some of the counts. The State and the district court agreed that three of the counts of aggravated indecent liberties with a child were not supported by sufficient evidence, so the court dismissed those counts. When the trial resumed, Willis presented testimony from two of his children, Attelia and Taurus Willis. They testified generally that J.N. did not stay at the house during some of the times that J.N. had testified she visited Willis.

Finally, Willis testified on his own behalf. He explicitly denied touching J.N. sexually, trying to put his penis in J.N., and taking naked photographs or videos of her. Willis also denied setting up any email or Facebook accounts for J.N. but admitted that he had communicated with J.N. and her siblings through Facebook. Although he also conceded that J.N. had been to his house in Kansas City, Willis testified that she was there with her brothers and cousins and they all stayed outside of the house except when J.N. went inside to use the restroom. Willis likewise freely admitted that J.N. had been inside his truck and that he had been alone with J.N. one day when J.N.'s school called and said she was ill. After Willis testified, the defense rested.

The district court instructed the jury, and counsel made closing arguments. After deliberating for several hours over 2 days, the jury reached a verdict. The jury found

9

Willis guilty of two counts of aggravated indecent liberties with a child, one count of aggravated criminal sodomy, and one count of attempted rape. The jury acquitted Willis of four counts of aggravated criminal sodomy and one count of attempted rape.

Prior to sentencing, Willis filed a motion for new trial, which the district court subsequently denied. Willis also filed a motion for a departure sentence asking for a departure to the sentencing guidelines grid and a separate motion asking for a further downward durational departure from the applicable guidelines presumptive sentence. At the sentencing hearing on June 14, 2013, the district court found that there were no substantial and compelling reasons to grant a departure sentence. Accordingly, the district court denied Willis' motions and sentenced him to a hard 25 sentence for each conviction, to run concurrently. Willis timely appealed the district court's judgment.

DISCOVERY REQUESTS

Willis first contends that the district court erred by denying his discovery requests. Specifically, Willis argues that the district court erred in (1) denying him personal copies of discovery and (2) denying his request for documents relating to later rape charges and a missing person investigation involving J.N. Willis claims these errors require reversal of his convictions or, at least, a remand for the district court to conduct an in camera inspection of the documents in question. The State responds that Willis was not entitled to personal copies of discovery or to discovery on the subsequent incidents involving J.N.

The parties agree that an appellate court generally reviews a district court's discovery order for abuse of discretion. See *State v. Johnson*, 297 Kan. 210, 215, 301 P.3d 287 (2013). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014). To the extent that the

10

resolution of a discovery request requires statutory interpretation, however, an appellate court has unlimited review. See *State v. Jolly*, 301 Kan. 313, 320, 342 P.3d 935 (2015).

*Personal copies of discovery*

At a pretrial hearing on March 29, 2012, Willis asked to be personally provided with copies of all discovery given to his attorney; he wanted copies of the documents in order to better assist in his defense. The State informed the district court that Wyandotte County policy was to have an open file, "which means that defense attorneys and their clients are entitled to have everything" and, in exchange for this policy, Wyandotte County "ask[s] defense counsel not to provide personal copies of that with their client[s]." Although the State did not object to defendants reviewing discovery, it preferred that defendants not have personal copies. The district court denied Willis' request, reasoning that Willis' counsel had the discovery and could go over it with him.

At the time of Willis' request for personal copies of discovery, the controlling statute was K.S.A. 2011 Supp. 22-3212, which stated in relevant part: "Upon request, the prosecuting attorney shall permit *the defendant* to inspect and copy or photograph" certain specified discovery items, if relevant. (Emphasis added.) In addition, K.S.A. 22-3213(2) stated:

"After a witness called by the state has testified on direct examination, the court shall, on motion of the defendant, order the prosecution to produce any statement (as hereinafter defined) of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to *the defendant* for his examination and use." (Emphasis added.)

11

The question of personal copies of discovery came up again during the hearing on Willis' motion for new trial. The district judge noted the previous denial but stated:

"Here in the last few months, the Supreme Court—I believe it's [*State v. Marks*, 297 Kan. 131, 298 P.3d 1102 (2013)] is the case that came out that said, 'Well, you can't do that. That's a violation of the statue.' So clearly that was an error.

"However, the *Marks* case went on to find that under the circumstances of that case, it did not constitute reversible error. That the defendant had the necessary discovery. That it didn't really—that it didn't affect the outcome of the trial in any way and did not ultimately prejudice the defendant. And I think we've got the same situation here that the Supreme Court detailed in the *Marks* case.

"So while certainly under the statute the defendant should have been provided with copies of—not everything, but certain things according to the statute, I'm going to find, as the Supreme Court did in *Marks*, that it did not affect the outcome of this case. It did not unduly prejudice him."

On appeal, Willis cites *State v. Marks*, 297 Kan. 131, 298 P.3d 1102 (2013), for the proposition that the denial of his motion for personal copies of discovery materials was error. In *Marks*, the Kansas Supreme Court held: "The district court erred to the extent it held that K.S.A. 22-3212 and K.S.A. 22-3213 do not authorize a defendant to have personal copies of discovery and witness statements." 297 Kan. at 148.

The State briefly argues that because the legislature since has amended K.S.A. 22-3212 and K.S.A. 22-3213 to reflect that "the defense" is entitled to discovery rather than "the defendant," Willis was not statutorily entitled to receive personal copies of discovery. However, the State fails to argue or explain why the amendments should apply retroactively to Willis' case. A point raised incidentally in a brief and not argued therein is deemed abandoned. See *State v. Llamas*, 298 Kan. 246, 264, 311 P.3d 399 (2013). Similarly, in *Marks*, our Supreme Court noted that the legislature had "amended K.S.A. 22-3212 since Marks' trial, but the parties do not argue [how] those amendments impact our analysis." 297 Kan. at 147.

12

At the time Willis requested personal copies of discovery, the statutes in effect were identical to those examined in *Marks*. "The Kansas Court of Appeals is duty bound to follow the precedent of the Kansas Supreme Court. [Citation omitted.]" *State v. Vrabel*, 301 Kan. 797, 809, 347 P.3d 201 (2015). Because the statutes in question here were identical to the statutes in question in *Marks*, it is clear that, as the district judge himself noted, the denial of Willis' request for personal copies of discovery was error.

We now turn to whether this error was harmless. In *State v. Ward*, 292 Kan. 541, 552-65, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), our Supreme Court held that to find an error harmless under K.S.A. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error "did not affect the party's substantial rights, meaning it will not or did not affect the trial's outcome." 292 Kan. at 565-66. The party benefitting from the error always bears the burden of proving it harmless under this standard. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). The level of certainty by which a court must be convinced depends upon whether the error implicates a federal constitutional right. *Ward*, 292 Kan. at 565-66.

> "If an error infringes upon a right guaranteed by the United States Constitution, we must be convinced beyond a reasonable doubt that the error did not affect the outcome in light of the entire record. [Citation omitted.] If the error does not infringe upon a constitutional right, we apply the harmless error analysis of K.S.A. 60-261 and K.S.A. 60-2105 to determine whether there is a reasonable probability that the error affected the trial's outcome. [Citation omitted.]" *Marks*, 297 Kan. at 148.

The *Marks* court held that "[a] defendant's right to assistance in his or her defense does not translate to a constitutional right to personal copies of discovery, particularly when that discovery was already provided to his or her attorney. [Citations omitted.]" 297 Kan. at 149. Here, Willis' counsel acknowledged that he had been provided the discovery in question. Therefore, the denial of Willis' request for personal copies did not implicate a constitutional right and the nonconstitutional harmless error test applies.

13

As the State argues, the record reflects that defense counsel had all of the discovery and that he was able to cross-examine the State's witnesses. Although the State bears the burden to show the error harmless, there is no evidence in the record that the failure to provide Willis with personal copies of discovery affected the trial's outcome. As the district court noted, Willis' counsel could "go over that information with him." The district court did not restrict Willis from viewing the documents with counsel; it simply denied his request for personal copies to keep in his cell. Based on the entire record, and as our Supreme Court concluded in *Marks*, there is not a reasonable probability that the error in denying Willis personal copies of discovery affected the trial's outcome. Thus, the error was harmless and does not require reversal of Willis' convictions.

*Discovery of the subsequent incidents involving J.N.*

The second part of Willis' discovery argument deals with his request for any documents relating to (1) subsequently prosecuted rape cases in which J.N. was the alleged victim and (2) a missing person investigation for J.N. in April 2012. We must provide some additional information to place this discovery request into context. In April 2012, J.N. ran away from home. Also in April 2012, the State charged another man with the rape of J.N. in a separate criminal case. After further investigation, the State charged two other men in additional criminal cases for raping J.N.

In a pretrial motion for discovery, Willis specifically requested

"a. A copy of any and all statements made to law enforcement by [J.N.], regarding similarly alleged crimes.
"b. Any notes or written documents prepared by [J.N.], regarding similarly alleged crimes.
. . . .
"e. Any and all police reports, statements, notes or other information relating to the Amber Alert/missing person investigation initiated in April 2012 involving [J.N.]"

14

The State filed a motion in limine to exclude any evidence of the subsequent incidents involving J.N. The discovery motion and the motion in limine were argued together at a hearing on November 30, 2012. The State pointed out that the charges were filed against Willis in September 2011 and argued that the incidents involving J.N. in April 2012 were "too remote in time" to be relevant to Willis' case. The State also argued that any information about J.N.'s sexual history with other men would be inadmissible at Willis' trial. The State did not deny that it possessed written reports about the subsequent incidents involving J.N. Also, the State did not claim that the requested discovery was privileged or confidential, only that it was irrelevant to Willis' case.

Willis explicitly stated that he was not attempting to introduce details of the alleged rapes. However, defense counsel argued that the documents included in the discovery request may be relevant to establish motive. He explained that J.N. previously had threatened to run away from home and it was Willis who had prevented her from doing so. Defense counsel asserted that J.N. may have fabricated her allegations against Willis in order to get him out of the picture so that he would not hamper her attempts to run away. In particular, defense counsel asserted that J.N. left a note when she ran away from home, and he wanted to be able to read the note to determine if it was in some way related to the charges against Willis. Defense counsel also asserted that the information included in the discovery request could help explain and place into context Willis' Facebook messages to J.N. about her contacts with "older guys."

After hearing arguments of counsel, the district court denied Willis' motion for discovery and granted the State's motion in limine to exclude any evidence of the subsequent incidents involving J.N. Defense counsel sought clarification and asked, "Are you saying that I'm not going to be allowed to talk about her—that running away from her family situation from the amber alert, and the resulting investigation, I'm not going to be able to talk about any of that?" The district court responded, "Correct." There is no

15

indication in the record that the district court ever reviewed or examined the documents included in Willis' discovery request about the subsequent incidents involving J.N.

Willis renewed the discovery issue in his posttrial motion for new trial. Specifically, Willis asserted that the prohibition against evidence related to J.N. running away prevented him "from offering evidence for his theory of the case that [J.N.] fabricated her story in order to get [Willis] out of the picture so that he would not hamper her attempts to get away." In denying the motion for new trial, the district court reaffirmed its earlier denial of discovery, stating that the court remained unconvinced that the later rape cases and running away were relevant in any way to the instant case.

On appeal, Willis argues that the district court erred in denying his requests for discovery of the subsequent incidents involving J.N. without first examining the documents subject to the discovery request. Willis asserts that this error requires reversal of his convictions or, at least, a remand for the district court to conduct an in camera inspection of the documents in question. The State reasserts its arguments that Willis was not entitled to discovery of the documents concerning the April 2012 incidents involving J.N. because the incidents were too remote in time and the discovery of information about the subsequent rapes would not have led to admissible evidence at Willis' trial. The State also argues that any error in the denial of the discovery request was harmless.

K.S.A. 2011 Supp. 22-3212(b)(1), in effect at the time Willis made his discovery requests, stated:

> "Upon request, the prosecuting attorney shall permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, which are or have been within the possession, custody or control of the prosecution, and which are material to the case and will not place an unreasonable burden upon the prosecution."

Willis points this court to *State v. Shoptaw*, 30 Kan. App. 2d 1059, 1063-66, 56 P.3d 303, *rev. denied* 275 Kan. 968 (2002), and *State v. Griswold*, No. 94,835, 2006 WL 2440009, *1-4 (Kan. App. 2006) (unpublished opinion), to support his argument that the district court erred by denying his request for discovery without first reviewing the records in camera. In *Shoptaw*, the defendant issued a subpoena duces tecum to obtain the alleged victim's mental health records from counseling that occurred before the crime. 30 Kan. App. 2d at 1063-64. Defense counsel did not explain the potential relevance of the records; instead counsel requested the records "to 'give the defense an opportunity to consult with an expert to see if there is, in fact, a mental condition which would have something to do with the . . . case.'" 30 Kan. App. 2d at 1063. The mental health center which held the records filed a motion to quash the subpoena based on doctor-patient privilege. The district court granted the motion and quashed the subpoena, without first reviewing the records in camera.

On appeal, this court reviewed the United States Supreme Court's opinion in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), in which the Court employed a due process analysis in holding that a criminal defendant was entitled to an in camera review of potentially privileged records held by a state agency which the defendant alleged might disclose exculpatory evidence. *Shoptaw*, 30 Kan. App. 2d at 1064. In *Ritchie*, the Court had ordered the district court to conduct such a review and, if it found information that "'probably would have changed the outcome'" of the trial, the district court must grant the defendant a new trial. 480 U.S. at 57-58.

Applying *Ritchie*, this court noted that Shoptaw had not articulated anything specific in the records as being relevant to his case. 30 Kan. App. 2d at 1066. Despite that failure, this court recognized that "it is impossible to say whether any of the information contained in [the alleged victim's] record would have been material to Shoptaw's defense because no one involved in the case looked at the subpoenaed records." 30 Kan. App. 2d at 1066. Therefore, "in order to adequately protect Shoptaw's constitutional rights, as well

17

as [the alleged victim's] interest in her privileged communications with the treatment facility," this court ordered the district court to conduct an in camera review of the record "to determine if there is any evidence that probably would have changed the outcome of the trial." 30 Kan. App. 2d at 1066. If there was such evidence, "then Shoptaw would be entitled to a new trial." 30 Kan. App. 2d at 1066.

Similarly, in *Griswold*, this court addressed the question of whether a district court erred by denying a defendant's request to have the court conduct an in camera review of the personnel files of two detectives involved in the case. 2006 WL 2440009, at *1. The detectives had been suspended from a task force, and the Kansas Bureau of Investigation (KBI) was investigating one of the detectives. Although the defendant admitted she did not know the contents of the personnel files or the reasons for the suspensions or investigation, she alleged that the personnel files might contain information about the detectives' veracity, which would be at issue in the case. The district court denied the discovery request, calling it "'a fishless fishing expedition'" and refused the request to conduct an in camera review of the files on the ground that specific instances of bad conduct would be inadmissible at trial. 2006 WL 2440009, at *2.

On appeal, this court noted that our Supreme Court has held that a defendant bears the burden of showing the materiality and reasonableness of a discovery request. 2006 WL 2440009, at *3; see *State v. Kessler*, 276 Kan. 202, 212, 73 P.3d 761 (2003). However, this court noted that Griswold could not demonstrate the materiality of her request because, as she had told the district court, she did not know the contents of the files. 2006 WL 2440009, at *3. This court recognized:

> "This presents a Catch-22 for Griswold:  as in *Shoptaw*, without an in camera inspection by the court, there was no way of knowing whether the files contained material information. Hence, it appears an in camera inspection of the files was warranted to assess the materiality of the information contained therein. We find ourselves in the same position as the *Shoptaw* court." 2006 WL 2440009, at *4.

18

Although not cited by Willis, we note that in *State v. Riis*, 39 Kan. App. 2d 273, 273-78, 178 P.3d 684 (2008), this court followed *Griswold* in holding that a district court erred in denying the defendant's motion for an in camera inspection of reports from the KBI's investigation of an officer involved in the defendant's case. The defendant filed the motion after he pled no contest to the charges and was sentenced. The *Riis* court ordered the district court to conduct an in camera inspection of the records, looking for evidence concerning the officer's credibility and, if it found such evidence, the district court was ordered to provide the evidence to Riis and reconsider his motion to withdraw his plea. 39 Kan. App. 2d at 278.

The State attempts to distinguish *Griswold* and *Shoptaw* by pointing out that defense counsel in both cases requested an in camera review of the records, while Willis' counsel did not. The record on appeal shows that Willis' counsel did not ask the district court to review the requested documents in camera, but the State fails to explain how that failure is fatal to the request. While it is certainly better practice for defense counsel to explicitly request an in camera review in these circumstances, the State does not cite any legal authority for the proposition that defense counsel was required to do so. Failure to support a point with pertinent authority is akin to failing to brief the issue. *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013).

We agree with the State that any evidence concerning J.N.'s subsequent rapes would have been inadmissible at Willis' trial. But as Willis explained in arguing for his discovery request, he was not attempting to introduce details of the alleged rapes. He was more interested in the requested discovery documents to the extent that they might have a bearing on J.N.'s motive to fabricate her allegations against Willis. The State's case against Willis rested almost exclusively on the credibility of J.N.'s testimony. Perhaps the requested discovery was relevant and would have led to admissible evidence; perhaps not. But how could the district court rule with certainty that the requested discovery had

19

no relevance to the charges against Willis without ever reviewing the documents and determining whether they contained information that could lead to admissible evidence?

Willis' counsel should have requested the district court to conduct an in camera inspection of the records. Despite this failure, we conclude that the district court abused its discretion in denying the discovery request without first reviewing the documents in question. Under the reasoning of *Shoptaw*, *Griswold*, and *Riis*, we remand for the district court to conduct an in camera review of the requested discovery and determine whether the documents contain information that "'probably would have changed the outcome'" of Willis' trial. See *Shoptaw*, 30 Kan. App. 2d at 1066. If the documents contain such information, the district court must grant Willis a new trial. Otherwise, the district court should deny the discovery request and Willis will have the opportunity to appeal such ruling. In the event of any subsequent appeal, all documents reviewed in camera by the district court should be sealed and included in the record on appeal.

Willis raises a separate issue that the district court erred by granting the State's motion in limine excluding evidence of the subsequent incidents involving J.N. This issue is rendered moot based on our disposition of the discovery issue.

EVIDENCE OF PRIOR CRIMES UNDER K.S.A. 60-455

Next, Willis argues that the district court violated his due process right to a fair trial by admitting evidence of prior crimes under K.S.A. 60-455. The K.S.A. 60-455 evidence in question here was J.N.'s statements that Willis had sexually abused her in Leavenworth County prior to the charged crimes, which occurred in Wyandotte County. Prior to trial, the State filed a motion seeking approval of its plan to introduce the evidence at trial, and the district court considered the motion at a pretrial hearing. The district court ultimately ruled that the evidence was relevant to show the relationship between the parties and to show "a continuing course of conduct."

20

During the trial, Panjada testified that J.N. stated that Willis sexually abused her as far back as April 2007 in Leavenworth County. The State admitted the DVD recording of J.N.'s forensic interview, in which J.N. alleged that Willis had sexually assaulted her in Leavenworth County. J.N. personally testified that Willis began abusing her in Leavenworth County. In his motion for new trial, Willis argued that the evidence was improperly admitted because it was highly prejudicial and was probative only as propensity evidence. In denying Willis' motion for new trial, the district court reaffirmed its reasoning from the pretrial motions hearing and ruled that the evidence was properly admitted. Willis now argues on appeal that admission of the evidence as propensity evidence violated his due process right to a fair trial.

As the State notes in its brief, there are a number of reasons this court should not reach the merits of Willis' argument. Willis objected to the K.S.A. 60-455 evidence at various times during the trial. By the time Willis made those objections, however, evidence that Willis sexually abused J.N. in Leavenworth County prior to the charged crimes had already been admitted, absent any objection, through Panjada's testimony. Thus, Willis failed to satisfy his burden to timely object to the admission of the evidence below. See *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009).

In addition, to the extent Willis did object to the admission of the evidence at trial, he never raised the due process argument he is asserting on appeal. Generally, a party may not raise a constitutional claim for the first time on appeal. See *State v. Noyce*, 301 Kan. 408, 410, 343 P.3d 105 (2015). There are three exceptions to this general rule:

> "'(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason. [Citation omitted.]' [Citation omitted.]" *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

21

Here, Willis alleges that the first exception applies. He correctly states that whether a statute violates a defendant's due process rights is a question of law. See *State v. Smith-Parker*, 301 Kan. 132, 165, 340 P.3d 485 (2014). He also claims that "[t]he facts underlying the admission of the prior crimes evidence are not disputed." Willis makes no further attempt to explain how this issue is "determinative of the case."

Willis has failed to establish that the first exception applies to permit him to raise a constitutional argument for the first time on appeal. Even though Willis correctly asserts that the new claim involves only a question of law, he fails to show how the resolution of the constitutional issue is determinative of the case. Here, the allegations that Willis sexually abused J.N. in Leavenworth County were not a major focus of the trial. The Leavenworth County incidents were mentioned at the trial in a general way and only to provide the jury with background information about the case. The evidence was briefly mentioned by the prosecutor during closing argument. Even if Willis can establish that the district court erred in admitting the K.S.A. 60-455 evidence, such a ruling would not be dispositive of the appeal. See *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006) (error in admitting evidence under K.S.A. 60-455 may be harmless).

Moreover, Willis fails to challenge on appeal the district court's stated reasons for admitting the K.S.A. 60-455 evidence. Here, the district judge explicitly stated that he was *not* allowing the evidence as propensity evidence and was instead allowing it to show the relationship between the parties and a continuing course of conduct. "When a district court provides alternative bases to support its ultimate ruling on an issue and an appellant fails to challenge the validity of each alternative basis on appeal, an appellate court may decline to address the appellant's challenge to the district court's ultimate ruling." *State v. Novotny*, 297 Kan. 1174, Syl. ¶ 1, 307 P.3d 1278 (2013).

In sum, Willis failed to contemporaneously object at the first admission of the evidence he now wishes to challenge; he has failed to explain persuasively why this court

22

should make an exception to the general rule that a party may not raise a constitutional claim for the first time on appeal; and he has failed to challenge the two bases the district court articulated on the record for admitting the evidence. For these reasons, we conclude that Willis' due process challenge is not properly before this court, and we decline to reach the merits of Willis' constitutional claim for the first time on appeal.

LIMITING INSTRUCTION REGARDING K.S.A. 60-455 EVIDENCE

Next, Willis claims that the district court gave the jury an erroneous limiting instruction regarding the K.S.A. 60-455 evidence. Specifically, the district court instructed the jury that evidence had been admitted "tending to prove" that Willis committed crimes other than those charged; the district court denied Willis' request to modify the language to say that evidence had been admitted "alleging" that Willis committed other crimes. Willis contends that the erroneous instruction improperly bolstered J.N.'s credibility and violated his right to a fair trial. In response, the State contends that the jury instruction was legally appropriate, that the district court was not required to deviate from the language of the Pattern Instructions for Kansas (PIK) instruction, and that any error in the jury instruction was harmless.

At the time of Willis' trial, the PIK instruction used to limit the jury's consideration of evidence of other crimes stated: "Evidence has been admitted tending to prove that the defendant committed (crimes) (a crime) other than the present crime charged. This evidence may be considered solely for the purpose of proving the defendant's [relevant purpose of evidence, *i.e.,* motive, opportunity, intent, etc.]." See PIK Crim. 3d 52.06.

Prior to the end of the trial, Willis filed a proposed supplemental jury instruction that requested two changes to the PIK instruction: (1) stating that evidence had been admitted "alleging" Willis committed other crimes; as opposed to stating that evidence had been admitted "tending to prove" Willis committed other crimes, and (2) instructing

23

the jury to consider the evidence solely for the purpose of "considering" whether there was a relationship or continuing course of conduct; as opposed to instructing the jury to consider the evidence solely for the purpose of "proving" whether there was a relationship or continuing course of conduct.

The district court approved the latter change but denied the former, stating, "That part [of the instruction] I'm not willing to change. I'm not going to—that's the PIK language, what I've got, and I'm going to stick with PIK." Thus, the district court gave the following limiting instruction to the jury: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crimes charged. This evidence may be considered solely for the purpose of considering whether there was a relationship and continuing course of conduct between the defendant and J.N."

"'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied___* U.S. ___, 132 S. Ct. 1594 (2012).'" *State v. Salary*, 301 Kan. 586, 592, 343 P.3d 1165 (2015).

"An appellate court examines jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury." *State v. Williams*, 42 Kan. App. 2d 725, Syl. ¶ 1, 216 P.3d 707 (2009), *rev. denied* 290 Kan. 1104 (2010); see also *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014). Although the use of PIK instructions is not required, it is strongly recommended, as these

"instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. [Citation omitted.]" *State v. Acevedo*, 49 Kan. App. 2d 655, 668-69, 315 P.3d 261 (2013); see also *State v. Dixon*, 289 Kan. 46, Syl. ¶ 10, 209 P.3d 675 (2009).

As Willis states, he properly preserved this issue for appellate review by proposing an amended instruction and objecting to the district court's failure to adopt it. On appeal, Willis does not argue that the district court erred in giving a limiting instruction; instead, he argues that the district court erred by denying his request to modify the wording of the limiting instruction. As Willis points out, the evidence admitted of the prior crimes was solely J.N.'s allegations that Willis sexually abused her as far back as April 2007 in Leavenworth County. Willis argues that by instructing the jury that this evidence "tend[ed] to prove" that Willis committed the prior crimes, the district court improperly bolstered J.N.'s credibility in the eyes of the jury.

The State points out that Kansas appellate courts generally advise Kansas district courts to use PIK instructions. See *Dixon*, 289 Kan. 46, Syl. ¶ 10. However, our Supreme Court also has stated that if "'the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition.'" *State v. Appleby*, 289 Kan. 1017, 1061, 221 P.3d 525 (2009).

We agree with Willis that the limiting instruction regarding the K.S.A. 60-455 evidence would have been improved by modifying the language to read: "Evidence has been admitted 'alleging' that the defendant committed crimes other than the present crimes charged." When K.S.A. 60-455 evidence consists of a prior conviction, the "tending to prove" language is appropriate. But when the defendant is disputing that the uncharged conduct ever occurred, and the K.S.A. 60-455 evidence does not consist of a

prior conviction, the better practice would be to change the language of the limiting instruction from "tending to prove" to "alleging."

Nevertheless, we do not find that the district court erred by giving the limiting instruction. As we previously stated, an appellate court examines jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law and could not have misled the jury. See *Hilt*, 299 Kan. at 184-85. Here, the district court also instructed the jury: "It is for you to determine the weight and credit to be given the testimony of each witness." This explicit instruction undermines Willis' argument that the limiting instruction given by the district court unfairly bolstered J.N.'s credibility. This conclusion is supported by the fact that the jury acquitted Willis of five of the nine charges against him. While the better practice in cases such as this one would be to change a limiting instruction's language from "tending to prove" to "alleging," we conclude that the jury instructions as a whole properly and fairly stated the applicable law and could not have misled the jury. Thus, we reject Willis' claim that he is entitled to a new trial based on erroneous jury instructions.

PROSECUTORIAL MISCONDUCT

Next, Willis claims that the prosecutor committed misconduct during closing argument that violated his right to a fair trial. The State argues that the statements complained about by Willis were not misconduct and, if they were, they do not warrant reversal of Willis' convictions.

An appellate court uses a two-step process to review allegations of prosecutorial misconduct in closing argument:

> "'First, an appellate court determines whether there was misconduct, *i.e.,* whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.,* whether the statements prejudiced the jury against the

26

defendant and denied the defendant a fair trial.' [Citation omitted.]" *State v. Knox*, 301 Kan. 671, 682, 347 P.3d 656 (2015).

The first comment Willis challenges occurred at the beginning of closing argument, when the prosecutor said:

> "'I miss us sitting around talking while Jade try and convince me to let her have company with her horny self. Is she still like she used to be, wanting to date older guys and still very horny? You know her better than I do. So is she?'
>
> . . . .
>
> "In this case, ladies and gentlemen, this Facebook message is a big deal. It's a very big deal. It can't be ignored. *He tried to be clever. It almost slipped under the radar.* Thank goodness it didn't." (Emphasis added.)

Willis characterizes the italicized language as an improper comment on his credibility. Willis argues that the comment implies that he was not telling the truth and was trying to "trick the jury." It is well established that a prosecutor cannot express a personal opinion on the credibility of a witness. *Knox*, 301 Kan. at 685.

We disagree that the prosecutor's statement in this instance was an improper comment on Willis' credibility. As the State points out, the prosecutor was talking about the Facebook message Willis sent J.N. Rather than implying that Willis was trying to "trick the jury" or was otherwise not credible, the prosecutor appears to have been arguing that Willis was trying to be clever by contacting J.N. through Facebook using a fictitious name so that other family members would not be aware of the communication. This particular statement by the prosecutor does not constitute misconduct.

The second set of comments that Willis challenges occurred when the prosecutor stated during closing argument:

27

"Ways we know the defendant's guilty in this case. This is the rest of my argument.

"*First of all, he had the opportunity to do it. He works in the church. He's a pastor—some sort of a pastor. He's raised four girls. You know, he's given access to [J.N.] as a trusted person in her life. So he has all the opportunity in the world, and he takes advantage of it.*

"*She—her mother was in prison when she's born. You've heard that. She's not as close to her father. He's not the father figure that LaMar was able to be. She's one of eight kids. She probably craves a little bit of extra attention. She felt her mom paid more attention to her brothers than her.*

"*Those are some things he took advantage of from her.*" (Emphasis added.)

Willis argues that the italicized language was impermissible because it improperly inflamed the passions of the jury by implying that Willis "was acting like a predator" and "creating an environment upon [which] he could prey on J.N." Willis bases his "predator" claim on *State v. Maybin*, 27 Kan. App. 2d 189, 198-99, 2 P.3d 179, *rev. denied* 269 Kan. 938 (2000), in which this court held that referring to a defendant as a predator was prosecutorial misconduct designed to inflame the passion and prejudice of the jury.

As the State points out, the prosecutor never referred to Willis as a "predator." Everything the prosecutor said in the challenged section was based on facts in evidence. Nicole testified that Willis had worked in a church; Jones testified that she gave Willis access to J.N. because she trusted him and considered him J.N.'s father; Jones testified that Willis had applied to be the pastor at her church; J.N. testified that she was not close to her biological father; and Willis testified that Jones was incarcerated when J.N. was born. The prosecutor's comments in this instance were not misconduct. See *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015) (stating that a prosecutor has wide latitude in crafting arguments and drawing reasonable inferences from admitted evidence). Because none of the prosecutor's statements constituted misconduct, we need not progress to the second prong of the analysis to determine if there was reversible error.

28

Next, Willis argues that even if no individual error merits reversal, this court should nevertheless reverse his convictions because of the cumulative effect of errors. In response, the State reasserts its position that the record does not support any of Willis' allegations of error.

"Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. [Citation omitted.]" *State v. Lewis*, 301 Kan. 349, 384, 344 P.3d 928 (2015). "Given that the reversibility test for cumulative error utilizes a totality of the circumstances approach, an appellate court must necessarily 'review the entire record and engage in an unlimited review.' [Citation omitted.]" *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014).

Here, only two of Willis' arguments are successful—(1) that the district court erred in denying his request for personal copies of discovery materials and (2) that the district court erred in denying his motion for discovery of the subsequent incidents involving J.N. However, we are remanding the second issue to the district court to conduct an in camera inspection of the materials sought. Thus, the only instance of harmless error in Willis' case was the denial of his request for personal copies of discovery materials.

Our Supreme Court has held that "[t]he cumulative error doctrine does not apply if no error or only one error arguably supports reversal." *State v. Ortega*, 300 Kan. 761, Syl. ¶ 6, 335 P.3d 93 (2014). Because we have found only one error for which Willis is obtaining no relief, the cumulative error doctrine does not apply.

Finally, Willis argues that the district court erred in denying his motions for a departure sentence. He contends that the district court abused its discretion when it found no substantial and compelling reasons existed to impose a departure. The State responds by noting that mitigating factors do not require a departure and arguing that the district court did not abuse its discretion in denying Willis' motions.

Under a law commonly known as Jessica's Law, the presumptive sentence for each of Willis' four convictions was "imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years," also called a hard 25. See K.S.A. 2011 Supp. 21-6627(a)(B)-(D). If the sentencing judge finds "substantial and compelling reasons, following a review of mitigating circumstances," however, the judge can depart from the hard 25 to the sentence pursuant to the Revised Kansas Sentencing Guidelines. See K.S.A. 2011 Supp. 21-6627(d)(1). K.S.A. 2011 Supp. 21-6627(d)(2) provides a nonexclusive list of mitigating factors a court might consider when deciding whether substantial and compelling factors exist to justify a departure sentence.

An appellate court reviews for abuse of discretion a district court's determination that there were not substantial and compelling reasons to depart from a Jessica's Law sentence. *State v. Randolph*, 297 Kan. 320, 336, 301 P.3d 300 (2013). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

Willis filed a motion and asserted the following as substantial and compelling reasons for the district court to grant a departure to the guidelines sentence: (1) he had no criminal history; (2) he was almost 50 years old, which meant that under a hard 25 he would not be eligible for parole until he was approximately 75 years old; (3) he was a

30

father, with grown daughters who testified at trial that he was a good father; (4) he was a grandfather; (5) he had strong support from family and friends; (6) he maintained his innocence and was convicted despite a lack of physical evidence; and (7) throughout his life, Willis had helped others and had been a preacher, a day-care provider, and a city worker, all without accusation of improper behavior. Willis also filed a second motion for departure, citing the same substantial and compelling reasons and asking the district court to further depart downward to half the applicable guidelines sentence. That was the lowest departure the court could grant, since Willis had been convicted of a statutorily defined "crime of extreme sexual violence." See K.S.A. 2011 Supp. 21-6818(a).

At the sentencing hearing, Willis' counsel reminded the district court that the jury deliberated for several hours and ultimately acquitted Willis on more than half of the charges. Willis' sister spoke on Willis' behalf, arguing that the charges were not true, stating that she trusted Willis with her own children, and asking for leniency for Willis. Willis' brother also spoke, requesting leniency for Willis. Willis spoke on his own behalf, reasserting his innocence and asking for mercy from the sentencing court.

The district judge addressed the departure motions at length. The judge examined each of Willis' asserted substantial and compelling reasons for departure, noting that the following were mitigating circumstances: (1) Willis had no criminal history, (2) his age, and (3) evidence of his good character. The judge also noted, however, that the jury had convicted Willis of four serious crimes. Ultimately, the district judge stated:

> "I have carefully considered the mitigating factors which do exist which I have mentioned on the record, compared them with the testimony in the case which the jury accepted beyond a reasonable doubt, and on that basis I'm going to find that substantial and compelling reasons have not—I cannot find those reasons substantial and compelling enough to depart from the statutorily prescribed sentence, which has a clear legislative purpose, which has been stated and reviewed many times by our appellate courts."

As the State points out, a district court is not obligated to grant a departure sentence simply because mitigating factors exist. See *State v. Jolly*, 301 Kan. 313, 323, 342 P.3d 935 (2015). Here, the district court carefully considered the proposed mitigating factors and found that they did not justify a departure from the statutorily prescribed sentence. The district court's decision to deny the departure sentence was not arbitrary, fanciful, or unreasonable, and the decision was not based on an error of law or fact. Thus, we conclude the district court did not abuse its discretion in denying Willis' motions for a departure sentence.

CONCLUSION

In conclusion, we agree with Willis' claim that the district court erred in denying his requests for discovery of the subsequent incidents involving J.N. without first reviewing the documents in question. Thus, we remand for the district court to conduct an in camera review of the requested discovery and determine whether the documents contain information that probably would have changed the outcome of Willis' trial. If the documents contain such information, the district court must grant Willis a new trial. However, we affirm the district court's judgment on all remaining claims.

Affirmed in part, reversed in part, and remanded with directions.