NOT DESIGNATED FOR PUBLICATION

No. 114,561

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMIL LAMONT SAHR SPALDING,
*Appellant*.


MEMORANDUM OPINION

Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed April 21, 2017. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Jacob Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MALONE and GARDNER, JJ.

*Per Curiam*:  Jamil Spalding appeals his conviction of one count of conspiracy to commit theft by deception after an incident where he attempted to obtain three iPhones from Best Buy. Spalding claims that (1) the evidence was insufficient to find him guilty because the State presented no evidence at trial that he made an agreement to make a false statement to deceive Best Buy; (2) the district court improperly bolstered the State's evidence when it instructed the jury that evidence had been admitted "tending to prove" that Spalding may have committed a crime other than the crime charged; and (3) the

1

district court and the prosecutor discouraged the jury from exercising its power of nullification. Finding no error, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 11, 2014, Spalding and his brother, James Spalding (James), approached Lauren Rhodes outside of a Kansas City blood bank. Rhodes, who was unemployed, was at the blood bank to donate plasma in order to make money. Spalding offered Rhodes between $100 and $200 if she would come with him and his brother to Best Buy and enroll in a cell phone plan in her name. Spalding told Rhodes that he would give her the money to pay for the deposit for the cell phones. When Rhodes asked who would pay the monthly bill, Spalding responded that he would take care of it. Even though she already had a cell phone and had no intention of making any payments on these new phones, Rhodes agreed with Spalding's plan.

Rhodes and Spalding entered a Best Buy in Overland Park, Kansas. At first, Spalding told Rhodes that he wanted her to purchase two cell phones but then changed his mind and asked for three. Rhodes approached Isaac Johnson, the cell phone sales clerk, and asked to enroll in a cell phone service plan. Johnson noticed some red flags during his interaction with Spalding and Rhodes. First, when Johnson asked Rhodes a question, Rhodes looked to Spalding for the appropriate response. It appeared to Johnson that although Rhodes was entering into the contract, it was Spalding who was in charge. Second, when it was time to pay for the deposit on the cell phones, Spalding provided the money and paid entirely in cash.

Dustin Snider—a loss prevention associate with Best Buy—observed the transaction from the store's surveillance cameras and also found it suspicious. As part of his job as a loss prevention associate with Best Buy, Snider received special training on fraudulent schemes relating to products sold by Best Buy. When Rhodes, Spalding, and

2

James entered the store, they caught Snider's eye because he already had seen James at the store earlier in the day with another woman. Snider also noticed that Rhodes, Spalding, and James came to the store in a vehicle with out-of-state tags, and he previously had been advised that Best Buy had encountered several cases of cell phone fraud that involved subjects traveling from out of state. Finally, Snider's suspicions were heightened when he observed that Rhodes kept referring to Spalding for confirmation when asked questions and when Spalding paid for the deposits on the phones.

Snider believed this was a fraudulent transaction whereby Spalding was using Rhodes to enter into a service contract with Verizon to obtain an iPhone to give to Spalding, but neither Spalding nor Rhodes had any intention of making payments on the contract. As explained by Snider at trial, Best Buy purchases iPhones from different carriers such as Sprint, Verizon, and AT&T and pays the full retail price for them up front—between $600 and $800 per phone. When a customer signs up for a cell phone service plan with a carrier, they can either buy the phone outright for the full retail price or sign up for a 2-year contract, which discounts the phone to $200. If the customer chooses the 2-year contract, the customer pays a $200 deposit on the phone and then makes monthly payments on the contract to the carrier. The customer has 90 days to fulfill the contract by paying the monthly charges. If they fulfill the contract, then the carrier will reimburse Best Buy for the remaining cost of the phone. For example, if a phone is worth $800 and the customer paid the $200 deposit, Best Buy will receive a credit of $600 from the carrier. If the contract is not fulfilled, however, then Best Buy takes the loss for each phone.

When a customer wants to obtain a 2-year contract, the sales clerk inputs their information into the computer system to see if the customer already has a pending contract. To avoid this problem, according to Snider, a common method of cell phone fraud occurs when one party pays a second party to sign up for a 2-year contract, but then the second party gives the phone to the first party. The second party does not make any

payments on the contract, and the first party sells the phones—often overseas—for double or triple their retail value.

Suspecting that this was Spalding's plan, Snider called Johnson and told him to push the "fraud button" which would slow down the computer in order to prevent the completion of the transaction. Snider also called the police to report suspected fraud. Johnson told Spalding and Rhodes that the computer system was not working, so they would have to come back the next day. Spalding and Rhodes left the store and, while they were in the parking lot, the police arrived and arrested them. According to Snider, if Spalding has been successful and left the store with the phones, Best Buy would have incurred a $2,100 loss.

After the arrest, Officer Andrew Schreiber interviewed Spalding. Spalding told Schreiber that Rhodes was his former girlfriend and they ran into each other at Best Buy that day; Spalding was unable, however, to tell officers her last name, her age, or where she lived. According to Spalding, Rhodes asked him to help her purchase a cell phone and Spalding agreed. The plan was that they would get cell phones for Rhodes, Spalding, and Spalding's mother. Spalding would pay the deposit on the phones, but everyone would pay their own monthly bill. Schreiber asked Rhodes if he had any other iPhones in his vehicle; Spalding said he did not. Schreiber obtained a search warrant for Spalding's vehicle, where he found 10 new iPhones in their original packaging.

On May 13, 2014, the State charged Spalding with one count of conspiracy to commit theft by deception. Spalding's jury trial began on February 23, 2015. Snider and Johnson of Best Buy testified about their interactions with Rhodes and Spalding and why they believed their behavior was suspicious. Officer Michael Schmidt testified that he responded to the Best Buy and transported Spalding to the police station for an interview. Schmidt also testified that he seized $1,282 in cash from Spalding.

4

Next, Anthony Long testified that he saw Rhodes at a bus stop on the morning of May 11, 2014, and asked if she wanted a ride to the blood bank. Rhodes accepted the ride, and Long dropped her off at the blood bank. When Long saw two men approach Rhodes and talk to her, he asked what was going on. One of the men stated that Rhodes was going to help them get some cell phones and they would pay her for doing so.

Rhodes testified as part of a diversion agreement with the State. Rhodes explained that she agreed to Spalding's request because of the money he offered and she just intended to give the phones to Spalding and earn a few hundred dollars. Finally, Schreiber testified about his conversation with Spalding at the time of his arrest and about the 10 iPhones found in Spalding's car. Spalding presented no evidence at the trial. At the conclusion of the evidence, Spalding's counsel argued to the jury that the State had presented insufficient evidence to support the charge.

The jury found Spalding guilty of conspiracy to commit theft by deception. On May 21, 2015, the district court sentenced Spalding to 6 months' imprisonment but granted probation for 12 months. Spalding timely appealed the district court's judgment.

SUFFICIENCY OF THE EVIDENCE

Spalding first claims that the evidence was insufficient to find him guilty of conspiracy to commit theft by deception. Specifically, Spalding argues that (1) there was no evidence that he and Rhodes made an agreement to make a false statement or representation and (2) the only evidence of a false statement or representation was directed at Verizon, not Best Buy.

Conversely, the State argues that the agreement between Spalding and Rhodes to deceive Best Buy need not be express, but instead can be implied from the parties' actions. Moreover, the State argues that even though the cell phone service contract was

5

with Verizon, the evidence established that Best Buy incurred a substantial loss for the cell phones if no payments were made under the contract.

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on the evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, the appellate court will not reweigh the evidence or reassess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

Spalding was convicted of conspiracy to commit theft by deception. "A conspiracy is an agreement with another person to commit a crime or to assist in committing a crime." K.S.A. 2016 Supp. 21-5302. K.S.A. 2016 Supp. 21-5801(a) defines theft as "any of the following acts done with intent to permanently deprive the owner of the possession, use or benefit of the owner's property," including obtaining control over the property by deception. "'Deception' means knowingly creating or reinforcing a false impression, including false impressions as to . . . intention or other state of mind." K.S.A. 2016 Supp. 21-5111(e).

The district court instructed the jury that to find Spalding guilty of conspiracy to commit theft by deception, the State must prove that:

> "1. The defendant agreed with others to commit and assist in the commission of theft by deception.
> "2. The defendant did so agree with the intent that theft by deception be committed.
> "3. The defendant or any party to the agreement acted in furtherance of the agreement by: recruiting Lauren Rhodes to purchase iPhones, entering the store to assist Lauren Rhodes with the purchase and providing money to make the purchase.

"4. That this act occurred on or about the 11th day of May, 2014, in Johnson County, Kansas."

The district court also provided the definition of theft by deception:

"1. Best Buy was the owner of the property.

"2. The defendant obtained control over the property by means of a false statement or representation which deceived Best Buy who relied in whole or in part upon the false representation or statement of the defendant or a co-conspirator.

"3. The defendant intended to deprive Best Buy permanently of the use or benefit of the property.

"4. The value of the property was at least $1,000 but less than $25,000."

Spalding first argues that there was no evidence that he intended to deceive Best Buy because any evidence of a false representation was directed at Verizon, not Best Buy. This argument is unpersuasive. The State presented evidence at trial that Rhodes never intended to make any payments after entering into the 2-year service contract with Verizon. While the contract may have been with Verizon, the false statement nonetheless was intended to deceive Best Buy as well. Snider testified that Best Buy purchases cell phones at full retail price from carriers such as Verizon. If a customer signs a service contract with Verizon, the customer then pays Best Buy $200 for the phone and walks out of the store. Best Buy agrees to this arrangement because once the customer fulfills the contract with Verizon by paying charges for 90 days, Verizon reimburses Best Buy for the remaining cost of the phone. However, if the customer does not pay under the contract, then Best Buy incurs a loss for the cost of the phone.

Snider testified that if the transaction had been completed and Rhodes and Spalding left the store with the cell phones, Best Buy would have lost $2,100 because neither Rhodes nor Spalding had any intention of fulfilling the contract. Moreover, Snider testified that Best Buy would not have sold the phones to Rhodes if she had informed

7

them that Spalding, and not Rhodes, would be making the monthly payments. This evidence is sufficient to enable a rational factfinder to find that Spalding and Rhodes intended to deceive Best Buy and permanently deprive Best Buy of the cell phones.

Spalding next argues that there was insufficient evidence for the jury to find that he and Rhodes made an agreement to make a false statement or representation. Again, this argument is unpersuasive. Spalding asked Rhodes to go to Best Buy with him and enter into a cell phone service contract with Verizon in order to obtain three cell phones. They agreed that although Rhodes would enter into the contract in her name and use her information, she would not actually make any payments on the contract. This is an agreement to make a false statement, the false statement being that Rhodes would pay the monthly charges on her service contract. As discussed above, it does not matter that the contract was with Verizon; the false statement here was intended to deceive Best Buy because if the transaction had been completed, Best Buy would have suffered a loss for the cost of the cell phones. The evidence presented at trial was sufficient to permit a rational jury to find that Spalding and Rhodes made an agreement to make a false statement to deceive Best Buy and permanently deprive Best Buy of the cell phones.

LIMITING INSTRUCTION ON K.S.A. 60-455 EVIDENCE

Spalding next claims that the district court erred in giving a limiting instruction to the jury on K.S.A. 60-455 evidence. At trial, Spalding objected to the admission of Schreiber's testimony about the other 10 iPhones found in Spalding's car. The district court determined that the evidence was relevant, in part, to show Spalding's intent. Because the district court admitted the evidence, in part, under K.S.A. 60-455, the district court instructed the jury that: "Evidence has been admitted tending to prove that the defendant may have committed a crime other than the present crime charged. This evidence may be considered solely for the purpose of proving the defendant's intent."

8

On appeal, Spalding argues that the district court improperly bolstered the State's evidence when it instructed the jury that evidence had been admitted "tending to prove" that he may have committed a crime other than the crime charged. Instead, Spalding claims that the district court should have instructed the jury that evidence had been admitted "alleging" that Spalding committed another crime. Spalding acknowledges that he did not object to the jury instruction at trial.

The State argues that the district court did not err in the language used in the limiting instruction. Alternatively, the State argues that if any error occurred, Spalding cannot show that there is a real possibility the jury would have returned a different verdict had the claimed error not occurred.

The standard of review when addressing challenges to jury instructions is as follows:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

Because Spalding did not object to the district court's instruction at trial, this court will not reverse his conviction unless the instruction given by the district court was clearly erroneous. An instruction is clearly erroneous only if the defendant firmly

convinces the appellate court that the jury would have returned a different verdict had the instruction not been given. *State v. Solis*, 305 Kan. 55, 64-65, 378 P.3d 532 (2016).

Spalding cites *State v. Willis*, 51 Kan. App. 2d 971, 992, 358 P.3d 107 (2015), *rev. denied* 304 Kan. 1022 (2016), to support his argument that the district court erred in giving the limiting instruction. In that case, the defendant was charged with multiple sex crimes and the State wanted to introduce evidence that the defendant had sexually abused the victim in another county prior to the charged crimes. The district court ultimately admitted the evidence under K.S.A. 60-455 to show the relationship between the parties and to show "a continuing course of conduct." 51 Kan. App. 2d at 988.

The district court instructed the jury that evidence had been admitted "tending to prove" that the defendant committed crimes other than those charged; the district court denied the defendant's request to modify the language to say that evidence had been admitted "alleging" that the defendant committed other crimes. 51 Kan. App. 2d at 990. On appeal, this court stated that the better practice is to use the term "alleging" rather than "tending to prove" when K.S.A. 60-455 evidence is not based on a prior conviction. 51 Kan. App. 2d at 992-93. However, this court found that the jury instructions as a whole properly stated the law and did not mislead the jury. 51 Kan. App. 2d at 993.

Spalding argues that the district court committed clear error when it instructed the jury using the "tending to prove" language because the instruction "did not leave the determination of the truthfulness of Officer Schreiber to the jury." The problem with this argument, however, is that in *Willis*, this court ultimately held that the district court did not err by giving the limiting instruction with the "tending to prove" language. See 51 Kan. App. 2d at 993. Instead, this court explained that "an appellate court examines jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law and could not have misled the jury." 51 Kan. App. 2d at 993. Noting that the district court also had instructed the jury

10

that it was up to them to determine the "weight and credit to be given the testimony of each witness," this court found that the jury instructions as a whole properly stated the law and did not mislead the jury. 51 Kan. App. 2d at 993.

The result here should be no different than the result in *Willis*. The instructions in Spalding's case considered as a whole "properly and fairly stated the applicable law and could not have misled the jury." *Willis*, 51 Kan. App. 2d at 993. Thus, the instructions were not erroneous. If there was no error concerning the jury instructions, there can be no clear error. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

JURY NULLIFICATION

Finally, Spalding claims that on several occasions the district court and the prosecutor discouraged the jury from exercising its power of nullification. Spalding first claims that the district court erred in giving the oath to prospective jurors during jury selection when it asked whether they would render a fair and impartial verdict based on the evidence presented in the courtroom. Next, Spalding argues that the prosecutor improperly told the jurors during voir dire that they must follow the law as instructed by the court. Finally, Spalding argues that the district court improperly instructed the jury that "[i]f you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *should* find the defendant guilty."

The State disagrees and argues that the district court and the prosecutor did not discourage the jury from exercising its power of nullification. Furthermore, the State claims that the district court's instruction that if the jury has no reasonable doubt as to the defendant's guilt it "should" find the defendant guilty, was not error because it was not the sort of mandatory instruction that the Kansas Supreme Court has held to be improper.

11

*Statements during jury selection*

In giving the oath to the prospective jurors during jury selection, the district court asked the following: "If you are selected as a juror in this case, will you render a fair and impartial verdict based upon the evidence presented in this courtroom, and the law as it pertains to this particular case as instructed by the Court?" The prosecutor also informed the jury during voir dire of its obligation to follow the law, explaining: "[W]hat will happen is Judge Welch . . . will give us jury instructions that will define the crime[,] that will talk about the evidence, and that will go with you to the jury room. And then, that's the law, and that's not up for debate." Spalding objects to these statements claiming they discouraged the jury from exercising its power of nullification.

Jury nullification is defined as:

> "'A jury's knowing and deliberate rejection of the evidence or refusal to apply the
> law either because the jury wants to send a message about some social issue that is larger
> than the case itself or because the result dictated by law is contrary to the jury's sense of
> justice, morality, or fairness. [Citation omitted.]'" *Silvers v. State*, 38 Kan. App. 2d 886,
> 888, 173 P.3d 1167 (2008).

Criminal defendants are not entitled to have the jury instructed on its power of nullification, but jurors do have the power to disregard the law and rules of evidence to acquit a defendant. *Silvers*, 38 Kan. App. 2d at 890. While this power exists, it is still "the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules in determining what facts are proven and render a verdict based thereon." *State v. McClanahan*, 212 Kan. 208, Syl. ¶ 3, 510 P.2d 153 (1973).

The district court's oath to the prospective jurors was required by Kansas law. Considered together, K.S.A. 22-3408(2) and K.S.A. 60-247(b) require that prospective jurors be examined under oath in regards to their qualifications to serve as jurors. See

12

*State v. Aguero-Aguilar*, No. 109,907, 2014 WL 3907093, at \*4 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1011 (2015). The district court's oath to the prospective jurors was proper and it cannot reasonably be construed as discouraging jurors from exercising their power of jury nullification.

Likewise, the prosecutor's statement during voir dire that jurors must follow the law as instructed by the court was not improper. This court addressed and rejected an argument similar to Spalding's in *State v. Cuellar*, No. 112,535, 2016 WL 1614037, at \*2 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* May 23, 2016. In that case, the defendant argued that the prosecutor committed misconduct when during jury selection he informed the jurors that "'[a]s jurors you will have decisions to make in this case, but one of those is not whether or not the law that will be applied here is fair or reasonable.'" 2016 WL 1614037, at \*2. The defendant argued that the prosecutor's statement constituted a misstatement of the law and prevented the jury from exercising its power of nullification. 2016 WL 1614037, at \*2. This court rejected the defendant's argument and held:

> "[I]t is clear that the prosecutor was simply explaining the jury's duty and ensuring that any potential jurors be willing to fulfill that role. And as our Kansas cases and statutes make clear that the jury's role is to decide questions of fact while accepting the rules of law, the prosecutor did not misstate the law." 2016 WL 16147037, at \*3.

Here, the prosecutor was merely informing the jury about its duty to follow the law pursuant to Kansas caselaw and statutes and ensuring that potential jurors could fulfill that role. The prosecutor's statements to the jurors during jury selection were proper statements of the law because although jurors have the power of nullification, they nonetheless have a duty to follow the law as provided by the district court.

13

*Use of PIK Crim. 4th 51.010*

After the close of evidence, the district court instructed the jury pursuant to PIK Crim. 4th 51.010 that "[i]f you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty." Spalding claims that this instruction was improper because the phrase "should find the defendant guilty" means the same thing as "must find the defendant guilty," and inappropriately directs a verdict in favor of the State and deprives the jury of its power of nullification.

Spalding did not object to the district court's instruction, so this court reviews the claim for clear error. An instruction is clearly erroneous only if the defendant firmly convinces the appellate court that the jury would have returned a different verdict had the instruction not been given. *Solis*, 305 Kan. at 64-65.

In *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014), the district court instructed the jury that "[i]f you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty." 301 Kan. at 163. The defendant argued that the instruction should have used the word "should" instead of "will." 301 Kan. at 163. Our Supreme Court agreed and held that the words "must" and "'will' . . . fly too close to the sun of directing a verdict for the State. A judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." 301 Kan. at 164.

In contrast to the instruction at issue in *Smith-Parker*, the district court here instructed the jury that it "should" find the defendant guilty, not that it "must" find the defendant guilty. The court in *Smith-Parker* only held that the words "must" and "will" are impermissible. 301 Kan. at 164. Furthermore, "should" does not mean the same thing as "must" because "should" is advisory, while "must" is an imperative. This court has reached the same conclusion on multiple occasions in recent opinions—admittedly,

14

however, not all of these decisions are final. See, *e.g.*, *State v. White*, 53 Kan. App. 2d 44, 54, 384 P.3d 13 (2016), *petition for rev. filed* November 7, 2016; *State v. Fuchs*, No. 115,695, 2017 WL 462853, at *3 (Kan. App. 2017) (unpublished opinion); *State v. Benewiat*, No. 114,676, 2017 WL 66355, at *8 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* February 6, 2017; *Cuellar*, 2016 WL 1614037, at *2; *State v. Singleton*, No. 112,997, 2016 WL 368083, at *4-6 (Kan. App. 2016) (unpublished opinion), *rev. denied* 305 Kan. __ (December 21, 2016).

As stated by a panel of this court:

"[A]s every teacher instructing a class knows, and as every parent admonishing a child knows, should is less of an imperative than must or will. [Citation omitted.] Nutritionists urge that we all should eat our vegetables. But that does not constitute a directive to have recalcitrant diners force-fed their vegetables if they do not comply. A parent admonishing a child that he should eat his lima beans is clearly less of an imperative than the phrase every child has heard at one time or another, 'You *will* eat your lima beans!' Should as used in this instruction is not the equivalent of 'must' or 'will' used in the instructions discussed in . . . *Smith-Parker*. *Should* is advisory. It is not an imperative. The district court did not err in giving this instruction." *Singleton*, 2016 WL 366083, at *6.

We adopt the above analysis. Here, the district court's instruction based on PIK Crim. 4th 51.010 was legally correct and did not negate the jury's power of nullification. Because there was no error concerning the jury instruction, there can be no clear error. *Betancourt*, 299 Kan. at 135.

Affirmed.