NOT DESIGNATED FOR PUBLICATION

No. 116,577

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

HEATH ALLEN UMPHENOUR,
*Appellant*.

MEMORANDUM OPINION

Appeal from Doniphan District Court; JAMES A. PATTON, judge. Opinion filed May 18, 2018.
Affirmed in part and vacated in part.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for
appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and HEBERT, S.J.

PER CURIAM:  A jury convicted Heath Allen Umphenour of one count of
aggravated indecent liberties with a child, one count of aggravated criminal sodomy, four
counts of sexual exploitation of a child, and two counts of breach of privacy. Four of
Umphenour's convictions were off-grid Jessica's Law offenses. For his off-grid Jessica's
Law convictions and Kansas Sentencing Guidelines Act (KSGA) grid convictions, the
trial court sentenced Umphenour to a controlling hard 25 life sentence plus 68 months'
imprisonment followed by lifetime postrelease supervision.

1

Umphenour now appeals his convictions and sentences, arguing the following: (1) that some of his convictions for sexual exploitation of a child are multiplicitous; (2) that the prosecutor committed error during closing arguments; (3) that the trial court erred by denying his departure request to be sentenced on the KSGA grid for his off-grid Jessica's Law convictions; and (4) that the trial court erred by ordering that he serve lifetime postrelease supervision for his off-grid Jessica's Law offenses. Finding that the trial court erred when it ruled that Umphenour must serve lifetime postrelease supervision following the completion of his off-grid Jessica's Law sentences, we vacate the imposition of lifetime postrelease supervision as to Umphenour's four off-grid Jessica's Law convictions and affirm his remaining convictions and sentences.

After dating for several months, Umphenour and K.D.B. moved into a house together; they married shortly thereafter. A few months after their marriage in December 2011, Umphenour adopted K.D.B.'s three daughters—M.B.U., K.B.U., and H.B.U. M.B.U. was born in January 1998; K.B.U. was born in February 2002; and H.B.U. was born in February 2003.

In addition to her daughters, K.D.B. allowed J.P.K., who K.D.B. had babysat since she was an infant and considered family, to stay at her house with Umphenour frequently. J.P.K. was born in February 1999.

On September 28, 2012, M.B.U. attended her high school homecoming football game followed by her high school homecoming dance. After the dance around 11:30 p.m., K.D.B. took M.B.U. and several of her friends to IHOP. As K.D.B. and M.B.U. were leaving, Umphenour was outside the house building a bonfire; K.B.U. was getting ready for bed. When K.D.B. and M.B.U. got back home in the early morning hours of September 29, 2012, both Umphenour and K.B.U. were in bed.

2

In the upcoming months, Umphenour and K.D.B.'s relationship deteriorated. On June 16, 2013, K.D.B. asked Umphenour to move out of the house. Right after Umphenour moved out, K.B.U. told her mother that Umphenour had sexually molested her "the night of homecoming, when [M.B.U. and K.D.B.] left to go for breakfast." She explained that she had told M.B.U. about the sexual molestation the day after homecoming, but the two agreed not to tell anyone because they believed they might be removed from their mother's custody.

K.B.U.'s specific allegation of sexual molestation was as follows: K.B.U. alleged "that she was laying in her bed [when Umphenour] came into her room and stuck his hand down her pants, [and then] pulled her shorts down and licked her [vagina]." K.B.U. alleged that although she pretended to be asleep, she saw Umphenour use his cell phone for light, while he was touching and licking her vagina. K.B.U. further alleged that when Umphenour had finished, Umphenour came back and asked her if she was okay; she responded by asking Umphenour if she could take a shower. She asserted that when she went to take a shower, she saw Umphenour in the corner of one of the bathroom doors, holding his cell phone up. She asserted that after she shut and locked this bathroom door, she could hear Umphenour trying to pick the lock of the door.

Once K.B.U. told her mother about the sexual molestation, K.D.B. confronted M.B.U. regarding whether K.B.U. had previously told her that Umphenour had sexually molested her. M.B.U., who had not been at home when K.B.U. made the allegation against Umphenour, confirmed that K.B.U. had told her that Umphenour had sexually molested her while they were getting breakfast following the homecoming events. She also confirmed that they decided not to tell anyone because they feared that they would be removed from K.D.B.'s custody. K.D.B. contacted the police.

During the ensuing police investigation, police seized an iPhone 4s, an iPhone 5, and a computer. The iPhone 4s was Umphenour's cell phone until Christmas 2012, when

3

he gave the cell phone to a daughter from a previous marriage. Umphenour decided to give the iPhone 4s to his daughter because he had upgraded to an iPhone 5. Before giving the iPhone 4s to his daughter, Umphenour placed a factory reset on the cell phone, which erased all information stored on the cell phone. Umphenour was still using the iPhone 5 when police began investigating this case. The computer was the family desktop computer located in Umphenour and K.D.B.'s home.

On the computer, police found two backups of Umphenour's iPhone 4s. Contained within these backups was all the "logical information" within Umphenour's iPhones, including his photos, documents, notes, and installed applications. According to those backups, an application called Video Safe had been installed on Umphenour's iPhone 4s. To access the Video Safe application, a password was required. The password to the Video Safe application installed on Umphenour's iPhone 4s was 4848; 48 was Umphenour's old high school football jersey number. Inside the files of the Video Safe application were the following: (1) a photo of a female's genitals; (2) a different photo of the same female's genitals; and (3) a film of two nude females changing clothes. It is undisputed that the film of the two nude females was taken at night and from outside a window.

When asked about the photos of the female's genitals, K.B.U. identified the genitals as her own. The Video Safe application time and date information linked to these photos was September 29, 2012, 1:47 a.m. and 1:53 a.m., respectively. When asked about the film depicting the nude females, M.B.U. and J.P.K. identified themselves as the nude females. They both asserted they had no idea anyone was filming them. The Video Safe application time and date information linked to the film was November 13, 2012, at 6:48 p.m. Further, the GPS coordinates associated with the film indicated that the film was made at or within feet of Umphenour's and K.D.B.'s house.

4

In addition to the genital photos and the film, the police found several copies of a photo of the top half of a female's breast, which M.B.U. identified as her own, and several copies of a photo of males engaging in anal sex in Umphenour's iPhone 4s backups. The photo of the males engaging in anal sex was also on Umphenour's iPhone 5. This photo had previously been identified as child pornography by the Child Victim Identification Program and National Center for Missing and Exploited Children. Moreover, a search of Umphenour's Internet history revealed that during his marriage with K.D.B., he had searched or viewed hundreds of pornographic videos with incest themes, very often fathers engaging in sexual acts with their daughters.

The State ultimately charged Umphenour with 16 counts based upon the alleged sexual molestation of K.B.U. and the photos and film contained in the computer backups. Concerning K.B.U., Umphenour was charged with the following: one count of aggravated indecent liberties with a child for lewdly fondling or touching of K.B.U., an off-grid person felony in violation of K.S.A. 2012 Supp. 21-5506(b)(3)(A); one count of aggravated criminal sodomy for intentionally sodomizing K.B.U., an off-grid person felony in violation of K.S.A. 2012 Supp. 21-5504(b)(1); four counts of sexual exploitation of K.B.U.—two counts for using K.B.U. to engage in sexually explicit conduct with the intent to promote her performance, each off-grid person felonies in violation of K.S.A. 2012 Supp. 21-5510(a)(1), and two counts for possessing visual depictions of K.B.U. engaged in sexually explicit conduct, each severity level 5 person felonies in violation of K.S.A. 2012 Supp. 21-5510(a)(2); and one count of attempted breach of privacy for the attempted photograph of K.B.U. in the bathroom, a severity level 10 person felony in violation of K.S.A. 2012 Supp. 21-6101(a)(6) and 21-5301(a). Significantly, the two photos of K.B.U.'s genitals found on the computer backups of Umphenour's iPhone 4s served as the basis for the State's charges for sexual exploitation of a child in violation of K.S.A. 2012 Supp. 21-5510(a)(2).

5

Concerning the film, the State charged Umphenour with two counts of breach of privacy,—one count for violating M.B.U.'s privacy and one count for violating J.P.K.'s privacy—with each count being a severity level 8 person felony in violation of K.S.A. 2012 Supp. 21-6101(a)(6). The State's remaining charges involved the photos of the breast and the males engaging in anal sex. For these photos, the State charged Umphenour with seven counts of sexual exploitation of a child.

Umphenour's jury trial on his charges was held between May 9, 2016, and May 20, 2016. During his trial, through the testimony of K.D.B., K.B.U., M.B.U., J.P.K., police officers, and computer forensic analysts, the State presented the preceding evidence. Umphenour's trial strategy hinged on the following arguments: (1) that there were rumors that K.B.U. lied about being molested which supported his innocence; (2) that there were inconsistencies in K.B.U.'s and M.B.U.'s statements; (3) that there was no evidence to support his guilt; (4) that the lead investigator failed to fully investigate the case; (5) that he did not behave like a guilty man; and (6) that the State was running a "smear campaign" against him because he liked to watch porn.

In the end, the jury convicted Umphenour of all the counts involving K.B.U. as the victim except for the count of attempted breach of privacy. The jury convicted Umphenour of both counts of breach of privacy stemming from the film of M.B.U. and J.P.K. The jury acquitted Umphenour on the remaining seven counts of sexual exploitation of a child stemming from the photos of the breast and the males engaging in anal sex.

Before sentencing, Umphenour moved for a durational departure in which he requested that he be sentenced on the KSGA grid and then receive a further departure to half his presumptive grid sentence for his four off-grid Jessica's Law offenses. He argued that he was entitled to this departure because of his lack of criminal history, his good employment record, his past efforts to support his family financially, his good behavior

6

while awaiting trial, his desire to rehabilitate and reunite with family, and his current family support.

At sentencing, the State opposed this motion. It argued that the mitigating factors that Umphenour had provided for his durational departure were not compelling. The trial court agreed with the State, denying the durational departure motion. It then sentenced Umphenour for his crimes.

For his aggravated indecent liberties, aggravated sodomy, and off-grid sexual exploitation of a child convictions, the trial court sentenced him to four concurrent hard 25 life sentences, followed by lifetime postrelease supervision. For each of his severity level 5 sexual exploitation of a child convictions, the trial court sentenced Umphenour to 34 months' imprisonment followed by lifetime postrelease supervision. For each of his breach of privacy convictions, the trial court sentenced Umphenour to 9 months' imprisonment. The trial court ordered that Umphenour's severity level 5 sexual exploitation of a child convictions and breach of privacy convictions run consecutive to each other and to his concurrent life sentences. Thus, Umphenour's controlling sentence was a hard 25 life sentence plus 68 months' imprisonment followed by lifetime postrelease supervision.

*Are Umphenour's Sexual Exploitation of a Child Convictions Multiplicitous?*

Umphenour's first argument involves whether some of his convictions are multiplicitous, violating his rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Umphenour recognizes that he did not challenge any of his convictions as multiplicitous below. Yet, he argues that this court should consider his argument, in part, to ensure his fundamental rights are not violated. This court has previously considered multiplicity arguments for the first time on appeal because such arguments involve a

7

defendant's fundamental right to a fair trial and involve only questions of law. *State v. Housworth*, No. 115,836, 2017 WL 2834502, at *13 (Kan. App. 2017) (unpublished opinion). For these same reasons, we will consider Umphenour's arguments even though he raises them for the first time on appeal.

Because multiplicity involves a question of law, this court has unlimited review over Umphenour's arguments. *State v. Hirsh*, 54 Kan. App. 2d 705, 718, 405 P.3d 41 (2017). Moreover, to the extent Umphenour's argument requires this court to interpret statutes, interpretation of statutes also involves a question of law over which this court has unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The most fundamental rule while engaging in statutory interpretation is that the intent of the Legislature governs. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016).

Next, we can dispose of all of Umphenour's arguments except his arguments concerning his convictions for sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2) because this is the only argument that Umphenour has properly briefed. In the introduction of his brief, Umphenour has requested that this court vacate one of his two convictions for sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2), one of his two convictions for sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(1), and one of his two convictions for breach of privacy under K.S.A. 2012 Supp. 21-6101(a)(6). He alleges that the preceding convictions were multiplicitous. Nevertheless, the only analysis Umphenour has actually provided in his brief concerning multiplicity involves his two convictions for sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2), which concern the possession of the two photos of K.B.U.'s genitals.

It is a well-known rule that a point raised incidentally in a brief and not argued therein is deemed waived and abandoned. *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015). Here, by not providing any argument or analysis on why his convictions for

8

sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(1) and breach of privacy under K.S.A. 2012 Supp. 21-6101(a)(6) were multiplicitous, Umphenour has abandoned his ability to challenge these convictions as multiplicitous on appeal. Accordingly, the only multiplicity argument Umphenour has properly briefed for appeal is his argument concerning the two counts of sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2). In turn, we will address only this argument.

Concerning this argument, Umphenour argues that his convictions are multiplicitous because they arise from the same conduct—when he backed up his iPhone 4s—and because K.S.A. 2012 Supp. 21-5510(a)(2) only allows one unit of prosecution. In making these arguments, Umphenour relies heavily on our Supreme Court's decision in *State v. Thompson*, 287 Kan. 238, 200 P.3d 22 (2008), while criticizing this court's decision in *State v. Hulsey*, No. 109,095, 2014 WL 4627486 (Kan. App.) (unpublished opinion), *rev. denied* 302 Kan. 1015 (2015). Umphenour recognizes that the *Hulsey* decision is on point but argues that it was wrongly decided. The State argues that the *Hulsey* court's analysis regarding the Legislature's intent when enacting K.S.A. 2012 Supp. 21-5510(a)(2)'s language "possessing *any* visual depiction of a child" establishes that K.S.A. 2012 Supp. 21-5510(a)(2) allows for multiple units of prosecution; therefore, the State argues that the analysis in *Hulsey* definitively proves that Umphenour's convictions are not multiplicitous.

K.S.A. 2012 Supp. 21-5510(a)(2) provides:  "Sexual exploitation of a child is: possessing any visual depiction of a child under 18 years of age shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender or any other person."

Again, Umphenour was charged and convicted of two counts of sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2) for possessing two photos of K.B.U.'s genitals. These photos were found in a backup of Umphenour's iPhone 4s

9

inside the Video Safe application. At trial, these photos were admitted into evidence as State's Exhibits 41 and 42, but both parties often referred to the photos by their computer file names—"185.jpg" and "187.jpg," respectively. The State alleged that Umphenour possessed the photos between November 15, 2012, and June 16, 2013—the date Umphenour allegedly backed up his iPhone 4s for the first time and the date that K.D.B. made Umphenour move out of the house.

In *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), our Supreme Court developed a test for determining whether a defendant's convictions for multiple violations of the same statute were multiplicitous; this is the "unit of prosecution test." The *Schoonover* court explained: "There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?" 281 Kan. at 496. To determine whether the convictions arise from the same conduct, some factors that may be considered are "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. at 497. To determine whether by statutory definition there are two offenses or only one, "the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution." 281 Kan. at 497.

In short, the Legislature's intent determines the allowable unit of prosecution under the *Schoonover* unit of prosecution test. Yet, if the Legislature's intent is ambiguous, courts should apply the rule of lenity, finding that statute authorizes only one conviction for a defendant's unitary conduct. 281 Kan. at 472.

In *Thompson*, our Supreme Court applied the unit of prosecution test to determine if Thompson's multiple convictions under K.S.A. 65-7006, a statute that criminalized

possession of certain substances with the intent to manufacture a controlled substance, were multiplicitous. 287 Kan. at 245-52. Thompson had possessed two different substances that were considered illegal under K.S.A. 65-7006, and he had been convicted of two separate crimes for his possession of the two different substances. The *Thompson* court held that Thompson's convictions were multiplicitous because Thompson had satisfied both prongs of the unit of prosecution test. 287 Kan. at 252.

First, the *Thompson* court found that the possession of the contraband substances stemmed from a unitary conduct given that it was Thompson's singular goal to manufacture a controlled substance. 287 Kan. at 245. Second, the *Thompson* court found that the "Kansas Legislature failed to state whether possession of each item in the statute for a single manufacturing operation may be prosecuted separately." 287 Kan. at 251. As a result, under the rule of lenity, the *Thompson* court held that Thompson could only be convicted of one violation of K.S.A. 65-7006. 287 Kan. at 251-52.

In *Hulsey*, this court considered whether Hulsey's 89 convictions of sexual exploitation of a child under K.S.A. 2010 Supp. 21-5510(a)(2) were multiplicitous. 2014 WL 4627486, at *1. All of Hulsey's convictions were based upon his possession of sexually explicit photos of the child-victim which were found on a computer; the photos had a creation date of either June 23, 2010, or June 28, 2010, or no creation date. On appeal to this court, Hulsey argued that his case was analogous to *Thompson* because like Thompson's unitary goal of manufacturing a controlled substance, he had the unitary goal of arousing or gratifying his sexual desires by possessing all of the photos. Hulsey further argued that his case was analogous to Thompson's case because "although the legislature 'could have provided that each item possessed . . . constitute[d] a separate violation of the statute, it did not do so.'" 2014 WL 4627486, at *10 (quoting *Thompson*, 287 Kan. at 247).

11

The *Hulsey* court rejected Hulsey's argument because it failed under the second prong of the unit of prosecution test. In doing so, the *Hulsey* court provided a detailed analysis on K.S.A. 2010 Supp. 21-5510(a)(2)'s legislative history, including how the Legislature amended the crime of sexual exploitation of a child for possession of sexually explicit images of a child after this court's decision in *State v. Donham*, 29 Kan. App. 2d 78, 81, 24 P.3d 750 (2001).

In *Donham*, this court held that defendants could be convicted of only one crime of sexual exploitation of a child under the plain language of K.S.A. 2000 Supp. 21-3516(a)(2), an earlier version of K.S.A. 2017 Supp. 21-5510(a)(2). 29 Kan. App. 2d at 84. K.S.A. 2000 Supp. 21-3516(a)(2) prohibited the possession of the following:

> "any film, photograph, negative, slide, book, magazine or other printed or visual medium or any audio tape recording or any photocopy, video tape, video laser disk, computer hardware, software, floppy disk or any other computer related equipment or computer generated image that contains or incorporates in any manner any film, photograph, negative, photocopy, video tape or video laser disk in which a visual depiction of a child under 18 years of age is shown or heard engaging in sexually explicit conduct . . . ."

Donham had been convicted of 90 counts of sexual exploitation of a child based upon individual sexually explicit images found on 18 floppy disks. The *Donham* court explained that "[t]he only . . . way to justify charging Donham with 90 counts of sexual exploitation of a child is to interpret the statute as prohibiting possession of each sexually explicit image of a child stored on or retrieved from a floppy disk." 29 Kan. App. 2d at 83. The *Donham* court found that under the plain language of K.S.A. 2000 Supp. 21-3516(a)(2), such an interpretation was not possible because charging centered on the possession of the medium that contained the sexual explicit images, not the sexually explicit images themselves. 29 Kan. App. 2d at 82-83. The *Donham* court concluded: "If the legislature had intended to criminalize possession of each sexually explicit image of a child contained on a floppy disk, the legislature would have included language such as

12

*possession of any image* stored on or retrieved from a floppy disk as a means of violating the statute." (Emphasis added.) 29 Kan. App. 2d at 83.

Nevertheless, in 2005 Senate Bill 147, the Legislature amended K.S.A. 21-3516(a)(2) to read as follows:

> "possessing any ~~film, photograph, negative, slide, book, magazine or other printed or visual medium or any audio tape recording or any photocopy, video tape, video laser disk, computer hardware, software, floppy disk or any other computer related equipment or computer generated image that contains or incorporates in any manner any film, photograph, negative, photocopy, video tape or video laser disk in which a visual depiction~~ *visual depiction, including any photograph, film, video picture, digital or computer generated image or picture, whether made or produced by electronic, mechanical or other means*, where such visual depiction of a child under 18 years of age is shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender, the child or another." L. 2005, ch. 162, § 4.

Of note, the 2005 amendments remained in effect until 2010, when the Legislature recodified the crime of sexual exploitation of a child under K.S.A. 21-5510 and amended subsection (a)(2). The 2010 amendments resulted in the following language, which is still in effect today: "Sexual exploitation of a child is: . . . *possessing any visual depiction* of a child under 18 years of age shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender or any other person." L. 2010, ch. 136, § 74; K.S.A. 2017 Supp. 21-5510(a)(2).

When the *Hulsey* court considered the 2005 amendment, it emphasized the rule that "when the legislature revises an existing law, the court presumes that the legislature intended to change the law as it existed prior to the amendment. *State v. Snellings*, 294

13

Kan. 149, 157, 273 P.3d 739 (2012)." 2014 WL 4627486, at *11. The *Hulsey* court then concluded:

> "[T]he legislature removed language criminalizing computer equipment containing child pornography, leaving only the criminalization of 'any visual depiction' of child pornography. With this revision, the clear statutory language criminalizes each sexually explicit visual image containing a child under 18 years old. How the images are collected or contained makes no difference under [the current statute] . . . . Thus, by statutory definition, Hulsey is guilty of possessing each image of a child less than 18 years old. It does not matter when he obtained or accessed the images. . . ." 2014 WL 4627486, at *12.

Turning our focus back to Umphenour's arguments, we can divide Umphenour's arguments into two categories:  (1) that following the *Hulsey* court's holding would lead to absurd results; and (2) that following the *Hulsey* court's interpretation of K.S.A. 2010 Supp. 21-5510(a)(2) would put Kansas at odds with other jurisdictions' interpretations of their particular sexual exploitation of child laws.

Regarding Umphenour's first argument, Umphenour argues that the *Hulsey* court's interpretation of K.S.A. 2010 Supp. 21-5510(a)(2) is absurd because this could lead to a person being convicted of hundreds of counts of sexual exploitation of a child based upon a single unitary act, such as buying a magazine or computer disk with multiple sexually explicit photos. Yet, as the State points out in its brief, although persons may be open to significantly more convictions under the *Hulsey* court's interpretation of K.S.A. 2010 Supp. 21-5510(a)(2), the practical effect of the *Hulsey* court's interpretation for sentencing purposes would be minimal because in cases involving multiple convictions, the defendant's total sentence cannot exceed twice his or her base sentence.  See K.S.A. 2017 Supp. 21-6819(b)(4) (the "double rule" statute).

14

Additionally, both Umphenour's first and second arguments ignore that the *Hulsey* court did not create this interpretation in a vacuum; instead, it is founded upon our Legislature's intent. Once again, the *Schoonover* court held that "the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution." 281 Kan. at 497. In other words, it is the Legislature's intent that controls the allowable unit of prosecution. In consequence, Umphenour's arguments regarding how other jurisdictions interpret their sexual exploitation of a child statutes is irrelevant. All that matters is what the Kansas Legislature intended when it enacted the current language of K.S.A. 2012 Supp. 21-5510(a)(2). And historically in Kansas, the use of the word "any" in a criminal statute has resulted in courts finding that there are multiple units of prosecution in cases where the defendant possessed multiple prohibited items. See *Housworth*, 2017 WL 2834502, at *14; *State v. Booton*, No. 113,612, 2016 WL 4161344, at *10 (Kan. App. 2016) (unpublished opinion); *Hulsey*, 2014 WL 4627486, at *12; *State v. Odegbaro*, No. 108,493, 2014 WL 2589707, at *9 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1018 (2015); *State v. Odell*, No. 105,311, 2013 WL 310335, at *8 (Kan. App. 2013) (unpublished opinion).

Most importantly, Umphenour has not provided any persuasive argument why the *Hulsey* court's interpretation of the Legislature's intent when enacting the language in the current sexual exploitation of a child law is wrong. Umphenour tries to equate his case to the *Thompson* case. Just like in *Hulsey*, Umphenour argues that if the Legislature truly wanted multiple units of prosecution under K.S.A. 2012 Supp. 21-5510(a)(2) it "'could have provided that each item possessed . . . constitute[d] a separate violation of the statute,' but it chose not do so." (Quoting *Thompson*, 287 Kan. at 247.)

Very clearly, however, the sexual exploitation of a child law that was in effect when *Donham* was decided prohibited possession of any medium containing images of children engaged in sexually explicit conduct. K.S.A. 2000 Supp. 21-3516(a)(2). Yet, with the passing of Senate Bill 147, the Legislature amended the sexual exploitation of a

child law so the possession of "any visual depiction" of a child engaged in sexually explicit conduct constitutes a crime. L. 2005, ch. 162, § 4. Hence, when the Legislature amended the sexual exploitation of a child statute in a manner that criminalized the possession of any visual depiction of sexually explicit images of children instead of criminalizing the possession of the medium containing the images of the sexually explicit photos of children, the Legislature did exactly what the *Donham* court suggested but what Umphenour asserts it did not—the Legislature provided that possession of each visual depiction of children engaging in sexually explicit conduct constituted a crime.

Finally, if there were any doubts about the Legislature's intent when enacting 2005 Senate Bill 147, the Summary of Legislation issued by the Legislative Research Department, in conjunction with the Legislative Coordinating Council, of which the President of the Senate and Speaker of the House are members, erases all doubts. The Summary of Legislation for 2005 Senate Bill 147 states: "The bill . . . amends the crime of sexual exploitation of a child *to allow one count of sexual exploitation of a child to be filed for each individual image of child pornography an offender possesses* and makes other changes to update the language of the crime." (Emphasis added.)

Accordingly, it is readily apparent that K.S.A. 2012 Supp. 21-5510(a)(2) allows multiple units of prosecution—one unit per visual depiction of a child engaging in sexually explicit conduct. As a result, Umphenour's two convictions for sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2) are not multiplicitous, and we affirm.

*Did the Prosecutor Commit Error During Closing Arguments?*

Umphenour's second argument concerns prosecutorial error. He alleges that the prosecutor misstated facts during closing arguments about the time and date the photos of

16

K.B.U.'s genitals were taken. Once again, the photos of K.B.U.'s genitals were contained in State's Exhibit 41, also called 185.jpg, and State's Exhibit 42, also called 187.jpg.

Regarding claims of prosecutorial error, our Supreme Court has created a two-step standard of review: (1) Did "the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial"; and (2) if so, did the error resulting from the prosecutorial acts "prejudice[] the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Under step two, "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record . . . .' [Citation omitted.]" 305 Kan. at 109.

It is a well-known rule that prosecutors cannot comment on facts not in evidence. *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). Yet, it is within the wide latitude afforded prosecutors during closing arguments to make reasonable inferences from the evidence. In determining whether a prosecutor's statements were reasonable inferences from the evidence, courts should view the prosecutors' statements in context. Furthermore, prosecutors may direct a jury to specific evidence in an effort to establish that the victim's testimony is more believable than the defendant's testimony or theory. *State v. Duong*, 292 Kan. 824, 830-32, 257 P.3d 309 (2011).

The specific statements by the prosecutor Umphenour takes issue with are as follows:

> "So when we're looking at [State's Exhibit] 41, something we really want you to focus on is look at the timestamp on that image. 9-29-2012 at 1:47 Central Daylight Time.

17

Remember how long [K.D.B.] and everybody else was at IHOP. . . . Until at least 4:00 a.m.

. . . .

"So Video Safe this image was put in Video Safe, and here's your date and time right here. . . .

. . . .

". . . Now this is a different image. This is 187.jpg, [State's] Exhibit 42. . . .

"Well, here's something I'd like to point out here as well. Look at the timestamp on this. Remember [K.B.U.] in her interview and when she was talking about it said that she thought this whole incident with [Umphenour] lasted she thought maybe ten minutes. She's pretty close, because if you look at this we know at least six minutes[,] what's going on because on 9-29-2012 at 1:53 Central Daylight Time was when the next picture was taken. That's six minutes and 18 seconds after the first one had been taken. And you also know that the incident didn't start immediately when the first picture was taken, and it ended as soon as the last picture was taken. You know it lasted longer than that, because if you recall his hands were down her pants before her pants got pulled down. So ten minutes is under the circumstances pretty close."

Umphenour alleges that the prosecutor's statements constituted misstatements of fact because the State's computer forensic analysist testified about the difficulties in determining when a photo found inside the Video Safe application was taken based upon the photo's time and date stamp. Mark Johnson, the State's computer forensic analyst, explained that Video Safe was an application designed to allow the user to hide photos and films. He explained that a person using Video Safe can either take a photo within the application or import a photo from their cell phone into the application. Johnson testified that whether a photo was taken within the Video Safe application or taken on an iPhone and then imported into the application, a person using the Video Safe application on an iPhone would be using the iPhone's hardware to take the photo; further, the iPhone hardware generally records certain information like the time and date a photo was taken.

18

But, when a photo is taken within the Video Safe application or later imported into the Video Safe application, *the application strips the time and date information generated by the iPhone hardware from the photo*. Johnson continued to explain, however, that regardless of whether a photo was taken within the Video Safe application or imported into the Video Safe application, *the Video Safe application had its own software that would record a time and date once "tak[ing] notice of the [photo]."* That is, Johnson testified that the Video Safe application software would generate its own time and date information for a photo based upon the time and date the photo was either taken within the application or imported into the application. Nevertheless, Johnson explained there was no way to tell from the Video Safe time and date information whether a photo was taken within the application or imported into the application.

Accordingly, Umphenour's argument that the prosecutor misstated the facts hinges on his contention that the prosecutor could not have known whether the photos shown in State's Exhibits 41 and 42 were taken within the Video Safe application at 1:47 a.m. and 1:53 a.m. or imported into the Video Safe application at 1:47 a.m. and 1:53 a.m. Thus, when the prosecutor stated that the photos were taken at 1:47 a.m. and 1:53 a.m., Umphenour asserts that the prosecutor mischaracterized the evidence in a manner that unfairly supported K.B.U.'s testimony. Umphenour asserts that the prosecutor's statements were also prejudicial because it bolstered the weight of the photos as evidence.

The State responds that the prosecutor was simply making a reasonable inference from the evidence presented at Umphenour's trial. The State emphasizes that although Johnson testified that there was no way to determine whether a photo was taken within the Video Safe application or imported into the Video Safe application, the application did record its own time and date information once it took notice of a photo. Thus, the State alleges that there was a basis in fact for the prosecutor's statements about the photos potentially being taken at 1:47 a.m. and 1:53 a.m. Alternatively, the State argues that any error committed by the prosecutor was harmless because of the following reasons:  (1)

19

the statements were addressed by a jury instruction stating that comments by counsel were not evidence; (2) the statements were fully challenged by defense counsel during Umphenour's closing arguments; and (3) the statements were a very minute part of the trial when considering the trial as a whole.

Here, the State's arguments are more persuasive than Umphenour's arguments because (1) the prosecutor was not commenting about or misstating facts within the evidence and (2) the prosecutor was making a reasonable inference based upon the evidence. Although Umphenour correctly asserts that the prosecutor used the word "taken" as opposed to the word "imported" when referring to the time and date stamps on the photos, the prosecutor could reasonably infer that Umphenour had "taken" the photos.

To begin with, it is important to emphasize that according to Johnson's testimony about how the Video Safe application records time and date information, the photos were either taken within the application or imported to the application on September 29, 2012, at 1:47 a.m. and 1:53 a.m.; thus, this is a fact in evidence. As a result, despite Umphenour's contention to the contrary, there was evidence presented at his trial supporting that the photos could have been "taken" on September 29, 2012, at 1:47 a.m. and 1:53 a.m. Next, during closing arguments, the prosecutor directed the jury to the photos shown in State's Exhibits 41 and 42 in the context of K.B.U.'s allegations. Again, the prosecutor noted the time and date stamps on the photos while also pointing out that the time and date stamps were consistent with K.B.U.'s allegations—(1) that the sexual molestation occurred while her mother and sister were out getting breakfast after homecoming and (2) that the sexual molestation lasted about 10 minutes. The prosecutor also reminded the jury that homecoming was on the evening of September 28, 2012.

Accordingly, when viewed in context, the prosecutor was clearly making a reasonable inference based upon the facts in evidence. Highly summarized, the prosecutor asserted that because K.B.U. alleged she was sexually molested by

20

Umphenour after homecoming while her mother and sister were at IHOP, and this sexual molestation included a period where Umphenour was using his cell phone for light, the jury could reasonably conclude that the photos of the female genitals, which were found in back up Video Safe files of Umphenour's iPhone 4s, were taken by Umphenour on September 29, 2012, at 1:47 a.m. and 1:53 a.m. as indicated on the Video Safe time and date stamps. The prosecutor was merely directing the jury to K.B.U.'s allegations and the time and date stamps and summarizing the conclusions that he believed could be drawn from this evidence, which was within his wide discretion and latitude as a prosecutor.

Moreover, even if the prosecutor's comments were improper, there is no reasonable possibility that the improper comments contributed to the verdict. First, as the State has noted in its brief, the trial court provided the jury with an instruction that both the prosecutor's and Umphenour's attorney's statements were not considered facts in evidence. Second, the jury was fully aware of Umphenour's complaints about the time and date stamps from the Video Safe application. During closing arguments, Umphenour's attorney challenged the prosecutor's comments by stressing to the jury that Johnson had testified that he could not say when the photos within the Video Safe application were taken. Umphenour's attorney encouraged the jury to review Johnson's testimony. Thus, the jury knew about the time and date stamp dispute, but the jury found Umphenour guilty of the four counts of sexual exploitation of a child anyway. Third, and perhaps most importantly, the nature of Umphenour's complaint establishes its harmlessness.

Again, Umphenour's argument is that because Johnson testified that it was impossible to tell if a person had "taken" a photo within the Video Safe application or "imported" a photo into the Video Safe application, the prosecutor erred when he stated that the photos were "taken" on September 29, 2012, at 1:47 a.m. and 1:53 a.m. Yet, if the photos were not taken within the Video Safe application on September 29, 2012, at 1:47 a.m. and 1:53 a.m., then the photos were imported into the Video Safe application

21

on September 29, 2012, at 1:47 a.m. and 1:53 a.m. Therefore, the best case scenario for Umphenour is that the photos had been imported onto his iPhone 4s on September 29, 2012, at 1:47 a.m. and 1:53 a.m. Simply put, given the timing of this import, the distinction is irrelevant. Either way, Umphenour had access to the photos no later than September 29, 2012, at 1:47 a.m. and 1:53 a.m.

As a result, it is readily apparent that had the prosecutor stated that the photos were "taken" or "imported" on September 29, 2012, at 1:47 a.m. and 1:53 a.m., the jury's verdicts would have remained the same. And in any event, our Supreme Court has held that minor misstatements of fact "uttered amongst thousands of pages of transcript, was not prejudicial to [a defendant's] right to a fair trial." *State v. Robinson*, 303 Kan. 11, 262, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017).

In conclusion, the prosecutor did not commit error during closing arguments by stating that the photos depicted in State's Exhibits 41 and 42 were taken on September 29, 2012, at 1:47 a.m. and 1:53 a.m. This was a reasonable factual inference given the evidence. Moreover, even if the prosecutor committed error, the State has established beyond a reasonable doubt that the jury's verdicts would not have been different but for the prosecutor's statement about the photos.

*Did the Trial Court Err by Denying Umphenour's Departure Motion?*

Umphenour's third argument involves whether the trial court erred by denying his departure motion. He argues that the trial court should have granted his departure request to sentence him on the KSGA grid, plus a further departure of one-half his presumptive grid sentence, for his four Jessica's Law offenses in accordance with K.S.A. 2017 Supp. 21-6627(d).

Under K.S.A. 2017 Supp. 21-6627(a), the mandatory minimum for Jessica's Law offenses is 25 years to life. Under K.S.A. 2017 Supp. 21-6627(d)(1), however, a judge may sentence a first-time Jessica's Law offender to a lesser sentence, if the "judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure." "Mitigating circumstances" include a defendant's lack of criminal history. K.S.A. 2017 Supp. 21-6627(d)(2)(A).

In *State v. Jolly*, 301 Kan. 313, Syl. ¶ 5, 342 P.3d 935 (2015), our Supreme Court explained that when considering a Jessica's Law departure motion, courts should follow a two-part statutory method:

> "[T]he sentencing court first . . . review[s] the mitigating circumstances without any attempt to weigh them against any aggravating circumstances. Then, in considering the facts of the case, the court determines whether the mitigating circumstances rise to the level of substantial and compelling reasons to depart from the otherwise mandatory sentence. Finally, if substantial and compelling reasons are found for a departure to a sentence within the appropriate sentencing guidelines, the sentencing court must state on the record those substantial and compelling reasons."

"'[S]ubstantial' in this context as something that is real, not imagined, something with substance and not ephemeral; the term 'compelling' implies that the court is forced, by the facts of a case, to leave the status quo or go beyond what is ordinary." 301 Kan. 313, Syl. ¶ 9. Furthermore, "even though mitigating circumstances must be present for a finding of substantial and compelling reasons, mitigating circumstances do not necessarily equal substantial and compelling reasons." 301 Kan. at 323.

When reviewing the trial court's denial of a motion to depart to the KSGA grid for a Jessica's Law conviction, appellate courts consider whether the trial court abused its discretion. An abuse of discretion occurs if the trial court made an error of law, made an

error of fact, or acted in an arbitrary, fanciful, or unreasonable manner. *State v. Randolph*, 297 Kan. 320, 336, 301 P.3d 300 (2013).

In his brief, Umphenour does not argue that the trial court made an error of law or an error of fact. Instead, Umphenour's sole argument regarding the denial of his departure motion is that the trial court's denial was "unreasonable" given his "individual circumstances." The specific individual circumstances that Umphenour emphasizes are his arguments about his lack of criminal history, his good employment record, and his "relationship with his children." Without citing any place in the record on appeal, Umphenour also asserts that he "demonstrat[ed] that he [did] not pose [an] additional threat to the community." Umphenour concludes that these reasons to depart were so substantial and compelling that this court must vacate his sentence and remand for resentencing.

The State responds that Umphenour's argument is meritless by stressing that the trial court's reasons for denying Umphenour's departure motion were proper. The State further responds that Umphenour's argument is meritless by pointing to cases where this court upheld the denial of Jessica's Law departure motions under similar factual circumstances. Clearly, the State's arguments are correct.

When the trial court denied Umphenour's departure motion, it explained:

"Well, the Court has heard two weeks of evidence. The Court heard motions. The Court heard about everything it can hear. The Court had letters from people who support you, and a letter from people who don't support you. The Court reviewed in particular the facts of this matter. The Court has looked at your motion for a departure and the reasons, and specifically outlined you've had a good work history, you've supported your family, you didn't have a criminal history, and you have the support of your family in this matter. If that were the only things that the Court would consider perhaps that would be substantial and compelling. But in this particular case the Court also heard the evidence

24

of the young lady as she testified when she's molested at the age of 11 years, and then pictures were taken of her private area during that same assault. You asked, and everyone asked [the Court] to disregard that, and [the Court] cannot. The Court has considered all of those factors. The Court has considered the law behind it.

"Jessica's Law deals with offenders who are over the age of 18 and a child who is under the age of . . . 14 . . . , and the purpose of that was to make sure that offenders who are convicted of that have a substantial penalty. Otherwise the legislature who establishes all of these penalties, it wouldn't have mattered to them. Obviously it was of great concern to them and that's why they did such.

"Your letters and everything only want you to address your feelings. Certainly the supporters of you have a belief that the other individuals are the spawn of the devil and that they did all of this to put you in a bad place. But the Court looked at the evidence and the evidence was uncontroverted. So when we talk about that, we don't just listen to what you said, but we look at the whole thing, and that's my job is to look at the entire picture.

"The Court finds that all requirements necessary for sentencing have been met."

Thus, to summarize, the trial court first considered Umphenour's proposed mitigating factors—his good work history, his past efforts to support his family financially, his lack of criminal history, and his current family support. Next, the trial court considered those proposed mitigating factors in light of the specific facts of Umphenour's case—K.B.U. was a very young victim, K.B.U. was assaulted and photographed, and the evidence at Umphenour's trial was uncontroverted. The trial court then found that when considering the preceding, Umphenour's provided mitigating factors were neither substantial nor compelling.

When considering the trial court's findings all together, the trial court's decision was plainly reasonable. Indeed, this conclusion seems particularly reasonable when one considers that although Umphenour was a first-time Jessica's Law offender, he was charged and convicted of violating four Jessica's Law offenses. Umphenour was nearly 40 years old when he committed these crimes. Additionally, as M.B.U.'s and K.B.U.'s

25

adoptive father, Umphenour abused his position of trust with these young victims. Although courts cannot weigh mitigating factors against aggravating factors, courts should consider the specific facts of the defendant's case, especially any egregious facts like the age of the victims and the relationship between the victims and the defendant, when determining whether the defendant's mitigating factors are substantial and compelling. *Jolly*, 301 Kan. at 324.

Moreover, as noted by the State in its brief, other courts have approved of the trial court's denial of Jessica's Law departure motions when the offender made similar arguments. For instance, in *State v. Willis*, 51 Kan. App. 2d 971, 997, 358 P.3d 107 (2015), this court affirmed the denial of Willis' departure motion in which he argued he was entitled to a departure to the KSGA grid and a further departure to half his presumptive grid sentence because he had no criminal history, he had family who said he was a good father, he had strong family support, and he had previously "helped others [as a] day-care provider, and a city worker." The trial court denied the motion after considering the mitigating factors in light of the specific crimes Willis had committed— aggravated indecent liberties with his stepdaughter, aggravated criminal sodomy of his stepdaughter, and attempted rape of his stepdaughter. This court then affirmed the denial of Willis' departure motion as reasonable because the trial "court carefully considered the proposed mitigating factors and found that they did not justify a departure from the statutorily prescribed sentence." 51 Kan. App. 2d at 998.

This case is no different than *Willis*. The trial court carefully considered Umphenour's arguments concerning why he was entitled to a departure. Nevertheless, it determined that those mitigating factors were not substantial and compelling when it considered the specific facts of his case. As a result, the trial court acted reasonably when it denied Umphenour's departure motion, and we affirm.

*Did the Trial Court Err by Imposing Lifetime Postrelease Supervision?*

Umphenour's final argument is that his sentence of lifetime postrelease supervision for his four off-grid convictions, that is, his conviction for aggravated indecent liberties with a child, his conviction for aggravated criminal sodomy, and his two convictions for sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(1), is illegal because these off-grid sentences require him to serve lifetime parole. Citing Supreme Court precedent, the State agrees that the trial court should not have imposed lifetime postrelease supervision.

"Whether a sentence is illegal is an issue of statutory interpretation, which is a question of law subject to unlimited review." *State v. Harsh*, 293 Kan. 585, 588, 265 P.3d 1161 (2011).

In *Harsh*, our Supreme Court explained that lifetime postrelease supervision and lifetime parole are different. Under K.S.A. 2017 Supp. 22-3717(u), defendants convicted of an off-grid Jessica's Law offense could become parole eligible after serving the minimum mandatory term of their life sentence. Thus, the *Harsh* court held that imposition of lifetime postrelease supervision for Jessica's Law offenses was illegal. 293 Kan. at 589-90. Yet, because parole is separate and distinct from a defendant's sentence, the *Harsh* court held that the proper remedy when a trial court errantly imposes lifetime postrelease supervision in such situations is to simply vacate the imposition of lifetime postrelease supervision. 293 Kan. at 590.

Thus, although Umphenour asks this court to remand for resentencing, this we need not do. Instead, we simply vacate the trial court's imposition of lifetime postrelease supervision for Umphenour's four off-grid Jessica's Law convictions.

Yet, it is important to note that the trial court also imposed lifetime postrelease supervision for Umphenour's two convictions of sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2). Sexual exploitation of a child is a "sexually violent crime" as meant under K.S.A. 2017 Supp. 22-3717(d)(1)(G) and (d)(2)(H). Furthermore, defendants may have to serve both lifetime parole and lifetime postrelease supervision. See, e.g., *State v. Williams*, 298 Kan. 1075, 1082, 319 P.3d 528 (2014) (where our Supreme Court recognized that defendants could serve both lifetime parole and postrelease supervision). In any event, Umphenour has not challenged the trial court's imposition of lifetime postrelease supervision for his sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2) as illegal. Accordingly, even though we vacate the trial court's imposition of lifetime postrelease supervision as to Umphenour's four off-grid Jessica's Law offenses, we also point out that should Umphenour ever be released from prison, Umphenour's convictions for sexual exploitation of a child under K.S.A. 2012 Supp. 21-5510(a)(2) still require him to serve lifetime postrelease supervision.

Affirmed in part and vacated in part.